UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CENTURY 21 REAL ESTATE LLC, a          CASE NO. CIV. 2:10-2751
Delaware Limited Liability
Company formerly known as
Century 21 Real Estate
Corporation,

      Plaintiff,

  v.

ALL PROFESSIONAL REALTY, INC.,
a California corporation doing
business as CENTURY 21 ALL
PROFESSIONAL; STEVEN M.
WRIGHT, an individual; and
CAROL WRIGHT, an individual,

      Defendants.
_____/

STEVE WRIGHT, CAROL WRIGHT and          CASE NO. CIV. 2:10-2846
ALL PROFESSIONAL REALTY, INC.,

      Plaintiffs,

  v.

CENTURY 21 REAL ESTATE LLC,          MEMORANDUM AND ORDER RE:
and DOES 1-100, inclusive,          MOTIONS FOR A PRELIMINARY
                                     INJUNCTION

      Defendants.
_____/

----oo0oo----

Century 21 Real Estate LLC ("Century 21") filed an action against All Professional Realty, Inc. ("All Professional"), Steven M. Wright, and Carol Wright arising from All Professional's continued use of Century 21's trademarks following the terminations of real estate brokerage franchise agreements for unpaid fees. (No. 2:10-2751.) Steve Wright,[1] Carol Wright, and All Professional filed a related action against Century 21 arising from the franchise agreements. (No. 2:10-2846.) Presently before the court are Century 21's motion for a preliminary injunction against All Professional, Steve Wright, and Carol Wright in the action initiated by it and Steve Wright, Carol Wright, and All Professional's motion for a preliminary injunction against Century 21 in the action initiated by them.

Both sides' motions for preliminary injunction were originally set for hearing on December 20, 2010. In order to accommodate the various evidentiary objections made by each side to the declarations submitted by the other, the court permitted the parties to file supplemental declarations to cure the alleged defects and permitted the parties to call witnesses to testify in support of or opposition to the motions. An evidentiary hearing was held on January 11, 2011.

I.   Factual and Procedural Background

---

[1]    The parties use "Steve Wright" and "Steven M. Wright." Because he is captioned as Steve Wright in the action initiated by him, the court will use Steve Wright.

In 1994, Steve and Carol Wright formed All Professional, a real estate brokerage company. (Steve Wright Decl. in Supp. of Mot. for P.I. against Def. Century 21 ("Steve Wright Decl. II") ¶ 2 (No. 2:10-2846, Docket No. 9); Carol Wright Decl. in Supp. of Mot. for P.I. against Def. Century 21 ("Carol Wright Decl. II") ¶ 2 (No. 2:10-2846, Docket No. 9); see also Steve Wright Decl. in Opp'n to Century 21's Mot. for P.I. against Defs. ("Steve Wright Decl. I") ¶ 2 (No. 2:10-2751, Docket No. 18); Carol Wright Decl. in Opp'n to Century 21's Mot. for P.I. against Defs. ("Carol Wright Decl. I") ¶ 2 (No. 2:10-2751, Docket No. 18).) All Professional signed its first franchise agreement with Century 21 in 1995, which allowed it to operate an office under the name "Century 21 All Professional." (Steve Wright Decl. II ¶ 3; Carol Wright Decl. II ¶ 3; see also Steve Wright Decl. I ¶ 3; Carol Wright Decl. I ¶ 3.) Century 21 is a franchisor of real estate brokerages. (Bertet Decl. in Supp. of Opp'n by Century 21 to Pls.' Mot. for P.I. ("Bertet Decl.") ¶ 3 (No. 2:10-2846, Docket No. 12); see also Rudin Decl. in Supp. of Reply of Mot. for P.I. by Century 21 against Defs. ("Rudin Decl. I") Ex. A, ¶ 3 (No. 2:10-2751, Docket No. 22).)

All Professional operates multiple offices and each office is governed by a separate franchise agreement with Century 21. In November of 2005, All Professional signed three ten-year franchise agreements with Century 21 for two offices in Sacramento and one office in Folsom, California, with an effective date of December 1, 2005, for each franchise agreement. (Bertet Decl. Exs. A-C §§ 1.5, 1.7; see also Iuliano Decl. in Supp. of Century 21's Mot. for P.I. against Defs. ("Iuliano Decl.

3

I") Exs. B-C §§ 1.5, 1.7 (No. 2:10-2751, Docket No. 10).)  The
Wrights state that at the time they signed the franchise
agreements on behalf of All Professional they were told that
Century 21 would be providing "new" tools and systems to grow
their offices.  (Steve Wright Decl. II ¶ 4; Carol Wright Decl. II
¶ 4; see also Steve Wright Decl. I ¶ 4; Carol Wright Decl. I ¶
4.)  The Wrights signed a personal guaranty.  (Bertet Decl. Exs.
A-C at 43-44; see also Iuliano Decl. I Exs. B-C at 43-44.)

Section 4.1 of the franchise agreements granted All
Professional the nonexclusive license to use Century 21's "Marks"
and "System."  (Bertet Decl. Exs. A-C § 4.1; see also Iuliano
Decl. I Exs. B-C § 4.1.)  "Marks" meant Century 21's trademarks,
service marks, and trade dress.  (Bertet Decl. Exs. A-C § 3.1.8;
see also Iuliano Decl. I Exs. B-C § 3.1.8.)  "System" meant,
inter alia, "policies, procedures, and techniques designed to
enable [] offices to compete more effectively in the real estate
sales market."  (Bertet Decl. Exs. A-C § 3.1.14; see also Iuliano
Decl. I Exs. B-C § 3.1.14.)  Century 21's System also included
"common use and promotion of certain Marks, copyrights, trade
secrets, centralized advertising programs, recruiting programs,
referral programs and sales management training programs." (Id.)

Century 21 has numerous registered trademarks.  (See
Iuliano Decl. I ¶¶ 3-4, Ex. A; see also Iuliano Decl. in Supp. of
Opp'n by Century 21 to Pls.' Mot. for P.I. ("Iuliano Decl. II")
¶¶ 3-4, Ex. A (No. 2:10-2846, Docket No. 18).)  According to
Century 21, Century 21 uses the trademarks on goods and in
advertisements, education, training manuals, newsletters, global
computer networks, and residential, commercial, and mortgage

4

brokerage services.  (Iuliano Decl. I ¶ 6; <u>see also</u> Iuliano Decl. II ¶ 6.)  The trademarks have become well recognized because of advertisements and promotions of goods and services offered by Century 21.  (Iuliano Decl. I ¶ 6; <u>see also</u> Iuliano Decl. II ¶ 6.)

In exchange for the rights granted under the franchise agreements, All Professional agreed to pay royalty fees of six percent of gross revenue, with an initial monthly minimum fee of $500.00, due at the time of settlement or close of escrow. (Bertet Decl. Exs. A-C §§ 7-8; <u>see also</u> Iuliano Decl. I Exs. B-C §§ 7-8.)  All Professional also agreed to pay two percent of its gross revenue for a National Advertising Fund ("NAF") for advertising expenses, with an initial monthly minimum fee of $562.00, due on the tenth of the following month.

Section 16.2.3 of the franchise agreements provided that Century 21 could terminate the agreement for good cause, which included curable and non-curable defaults.  (<u>Id.</u> § 16.2.3.)  Section 16.2.4, governing termination for curable defaults, provided that Century 21 could terminate the agreement with 30 days notice of the "proposed termination and the opportunity to cure the breach during the entire notice period, or such longer or shorter notice as is required or permitted by the law of the state where the Office is located," if the curable breach was the failure to pay financial obligations.  (<u>Id.</u> § 16.2.4.)

In addition to entering into the three franchise agreements in November of 2005, All Professional borrowed $75,000.00 from Century 21 pursuant to a Development Advance

Promissory Note ("Note").  The Note provided for a long-term,
annual repayment plan.  (Bertet Decl. Ex. D; <u>see also</u> Iuliano
Decl. I Ex. D.)  The Wrights signed a personal guaranty of the
Note.  (<u>Id.</u>)  Provided that All Professional was not in breach of
its franchise agreements, the yearly amount due would be forgiven
if All Professional reached certain gross revenue annual
thresholds.  (<u>Id.</u>)  The Wrights state that they executed the Note
relying on statements from Century 21 that it would provide All
Professional with the "necessary" tools, resources, and systems
to enable All Professional to meet the threshold requirements.
(Steve Wright Decl. II ¶ 7; Carol Wright Decl. II ¶ 6; <u>see also</u>
Steve Wright Decl. I ¶ 7; Carol Wright Decl. I ¶ 7.)  Thereafter,
All Professional did not meet the annual thresholds and thus
annual payments were not forgiven.  (Steve Wright Decl. II ¶ 8;
Carol Wright Decl. II ¶ 7; <u>see also</u> Steve Wright Decl. I ¶ 8;
Carol Wright Decl. I ¶ 8.)  The Wrights state that All
Professional was unable to meet the threshold requirements
because Century 21 failed to provide the necessary tools,
resources, and systems.  (Steve Wright Decl. II ¶ 8.; Carol
Wright Decl. II ¶ 7; <u>see also</u> Steve Wright Decl. I ¶ 8.; Carol
Wright Decl. I ¶ 8.)  When All Professional failed to make its
annual payment for 2007, Century 21 offered to cancel the payment
in exchange for a one-year extension of each franchise agreement
and a general release of claims.  (Suppl. Steve Wright Decl. in
Supp. of Pls.' Mot. for P.I. ("Suppl. Steve Wright Decl.") ¶ 8,
Ex. 12 (No. 2:10-2846, Docket No. 13).)  All Professional
rejected Century 21's offer: "I refused to agree to release
Century 21 from any liability because I thought that Century 21's

representatives had actively misrepresented material facts to me. I did not believe that such a request was proper, and I felt that Century 21 was violating its duties to me by asking for such a waiver." (Steve Wright Decl. II ¶ 8; see also Steve Wright Decl. I ¶ 8.) Century 21 rejected All Professional's counteroffer. (Suppl. Steve Wright Decl. ¶ 8, Ex. 12.) Thereafter, All Professional failed to make its annual payments on the Note.

Beginning in 2008, Steve Wright informed Century 21 about franchisees "openly competing with [him] and stealing [his] business and employees" in violation of Century 21's "Code of Conduct."[2] (Steve Wright Decl. II ¶ 9; see also Carol Wright Decl. II ¶ 8; Steve Wright Decl. I ¶ 9; Carol Wright Decl. I ¶ 9.) Steve Wright states that in about 2006 other Century 21 franchisees in the area began hiring agents away from All Professional and one Sacramento franchisee "stole" a commission check from All Professional.[3] (Steve Wright Decl. II ¶ 9; see also Steve Wright Decl. I ¶ 9.)

All Professional began to experience "short term cash

---

[2]    Century 21's Policies and Procedures Manual stated that franchisees "should avoid" recruiting sales associates of other franchisees and "advised that aggressive sales associates recruiting practices may subject the broker involved to claims of business interference by other brokers under applicable state law." (Steve Wright Decl. in Supp. of Mot. for P.I. against Century 21 ("Steve Wright Decl. I") Ex. 2 (No. 2:10-2846, Docket No. 9); see also Steve Wright Decl. in Opp'n to Century 21's Mot. for P.I. ("Steve Wright Decl. II") Ex. 2 (No. 2:10-2751, Docket No. 18).)

[3]    Steve Wright states that Century 21 also refused to do anything when a real estate office, not affiliated with Century 21, moved into the Folsom area operating as "21st Century Realty," arguably diluting All Professional's trade name as "Century 21 All Professional." (Steve Wright Decl. I ¶ 11; see also Steve Wright Decl. II ¶ 11.)

1  flow problems in 2009" and decided to "temporarily" close the

2  Folsom office.  (Steve Wright Decl. II ¶ 10; <u>see also</u> Steve

3  Wright Decl. I ¶ 10.)  Another Century 21 franchisee then moved

4  into the office that All Professional had vacated. (Steve Wright

5  Decl. II ¶ 10; <u>see also</u> Steve Wright Decl. I ¶ 10.)  Steve Wright

6  states that he "continued to complain to Century 21 about the

7  misrepresentations by Century 21 and the actions of other Century

8  21 franchisees" and became "concerned" that Century 21 was

9  "actively trying" to "run us out of business." (Steve Wright

10 Decl. II ¶ 11; Steve Wright Decl. I ¶ 11.)  Steve Wright had

11 heard "rumors" from other franchisees' agents that All

12 Professional was being "forced out" and that other franchisees

13 should recruit All Professional's agents.  (Steve Wright Decl. II

14 ¶ 11; Steve Wright Decl. I ¶ 11.)

15       With respect to Steve Wright's complaints to Century

16 21, Century 21 had no obligation in the agreements to prevent

17 other franchisees from recruiting All Professional's agents.  To

18 the contrary, Century 21 did not have the right to do so.

19 Section 21.2 provided:

20       [Century 21] will have no obligation to pay your
         commissions, taxes, wages or other expenses, and will
21       have no right to regulate or participate in the
         recruitment, selection, engagement, retention, discipline
22       or termination of your sales associates or employees, or
         to determine or limit the parties from whom you may
23       accept listings or to or for whom you may sell property,
         the commission rates you charge, the commission splits
24       between you and your sales associates, your working
         conditions, the manner or details of work performed by
25       you or your sales associates or employees, except as may
         be necessary to protect the Marks and goodwill.
26
   (Bertet Decl. Exs. A-C § 21.2; <u>see also</u> Iuliano Decl. I Exs. B-C
27
   § 21.2.)  The remedy, as brought out at the evidentiary hearing,
28

                                    8

was for All Professional to sue Select, the Century 21 franchisee that allegedly recruited All Professional's agents and moved into the same Folsom office that All Professional vacated.

According to Steve Wright's testimony, Bob Popp, a field representative for Century 21, did call Select about Steve Wright's complaints, even though Century 21 was not required to do so.  It was Steve Wright's belief that Select denied recruiting All Professional's agents.  This left Century 21 in what the court would characterize as a "he-said, she-said" dilemma.  Century 21 did not have the right to run either business.  It was at best in the position of a mediator, with no authority to enforce sanctions against either party.  Steve Wright testified that he did not know what Bob Popp did beyond making a call, and the court finds it quite possible that Century 21 did do something about Steve Wright's complaint.  Regardless, Select's alleged recruiting of All Professional's agents was no excuse for All Professional to stop paying fees to Century 21.

There is also no evidence that Century 21 cut off recruiting training because of Steve Wright's complaints.  Steve Wright complained in 2008, and in that year Tara Scholl of Century 21 cut off recruiting training.  No connection between the recruiting training and the complaints has been shown.

Beginning in May of 2009, All Professional stopped paying many of its franchise fees.  All Professional knew it had failed to pay them.  Century 21's System provides its franchisees with "detailed summaries of their account balances owed to Century 21, including specific information detailing the amounts owed by that franchisee, when the amounts are due, and the type

9

of amount due (i.e., royalty fee, national advertising fee fund fee, Development Advance Note, etc.)[.]" (Suppl. Rodriguez Decl. in Supp. of Opp'n by Century 21 to Pls.' Mot. for P.I. ("Suppl. Rodriguez Decl.") ¶ 4 (No. 2:10-2846, Docket No. 19).); see also Rudin Decl. I Ex. A ¶ 21.) All Professional had access to these detailed account summaries. (Suppl. Rodriguez Decl ¶ 4; see also Rudin Decl. I Ex. A ¶ 21.) Century 21 has provided the Custom Account Reports for each franchise agreement. (Suppl. Rodriguez Decl Ex. A; see also Iuliano Decl. I Exs. I-J.) The Custom Account Report specifies the date, amount, transaction type, and due date.

In letters dated April 5, 2010, Century 21 notified All Professional of its intent to terminate the three agreements and of All Professional's opportunity to cure. (Bertet Decl. Exs. E-G; see also Iuliano Decl. I Exs. E-F.) The notice pertaining to the River Park Drive office stated in pertinent part:

> Century 21 has advised you on numerous occasions that you are delinquent in the payment of your account. Upon review, we have determined that you are in default of the above-referenced Agreement for failing to pay fees when due. Your default constitutes a material breach of the Agreement, for which Century 21 may terminate the franchise.
>
> As of February 24, 2010, your account balance for this office was $59,327.41.
>
> In order to avoid termination, you must pay the balance in full no later than May 10, 2010.

(Bertet Decl. Ex. E; see also Iuliano Decl. I Ex. E.) The notice also provided contact information for Jacqueline Bertet, Century 21's Senior Director of Financial Services, and informed All Professional that failure to pay the balance would result in immediate termination of the franchise, which would then require

1   All Professional to pay the amount past due at the time of

2   termination, sums assessed in a post-termination audit, the

3   remaining balance of the Note, and lost profits.  (Bertet Decl.

4   Ex. E; see also Iuliano Decl. I Ex. E.)  The notice pertaining to

5   the Florin Road, Sacramento, office contained similar language

6   and stated that the balance was $23,492.69 as of February 24,

7   2010, requiring payment by May 10, 2010.  (Bertet Decl. Ex. G;

8   see also Iuliano Decl. I Ex. F.)  The notice pertaining to the

9   Folsom office contained similar language and stated that the

10   balance was $13,274.34 as of February 24, 2010, and required

11   payment by May 10, 2010.  (Bertet Decl. Ex. F.)

12        Following receipt of the notices, both Steve and Carol

13   Wright called representatives of Century 21.  Carol Wright called

14   Shalina ("Shelly") Rodriguez, a Director of Financial Services

15   for Century 21.  Carol Wright states that in the telephone call

16   she asked for an accounting and "disputed certain discrepancies I

17   saw in the notices of default."  (Carol Wright Decl. II ¶ 12; see

18   also Carol Wright Decl. I ¶ 13.)  Carol Wright states that she

19   identified the following issues in the telephone call: (1) the

20   default amounts included amounts owed under the Note, which was

21   not part of a franchise agreement; (2) Century 21 was "trying" to

22   charge fees for the Folsom office even though it had been closed

23   since August of 2009; and (3) there was a credit that All

24   Professional should have received.  (Carol Wright Decl. II ¶ 12;

25   see also Carol Wright Decl. I ¶ 13.)

26        Carol Wright "specifically asked what would be required

27   to resolve the claimed default":

28        [Rodriguez] informed me that we would need to pay

11

$124,432.20 and that Corporate would want a promissory note since the figure was greater than $100,000.  Our discussion revealed that Corporate was including the outstanding amount allegedly owed under [the Note], even though payment was not required under any of the Franchise Agreements.  The pay-off amount included the Hawaii office even though that franchise was owned by a separate entity.

(Suppl. Carol Wright Decl. in Supp. Of Pls.' Mot. for P.I. ("Suppl. Carol Wright Decl.") ¶ 4 (No. 2:10-2846, Docket No. 13).)

In her declaration, Rodriguez states that she received the call from Carol Wright on May 6, 2010, and Carol Wright stated that she wanted to discuss a "possible payment plan for the amounts owed." (Suppl. Rodriguez Decl. ¶ 2.)  Wright did not ask for an accounting, nor did she state that All Professional would pay the amounts due upon receipt of an accounting.  (Id.)

Following the phone conversation, Carol Wright e-mailed a letter to Rodriguez identifying "items we need to address before proceeding": (1) removing minimum royalty and NAF fees from the Folsom office account balance because it had been closed since August 31, 2009; (2) determining the cutoff date for "final payment calculations," with a possible date of March 31, 2010;[4] (3) "handling" the Hawaii office separately; (4) removing minimum royalty and NAF fees from January, February, and March of 2010; (5) separating the Note amount owed because of a "separate issue" as to why All Professional was not paying it; and (6) crediting $304.50 because of a Century 21 error.  Lastly, Carol Wright

_____

[4]   This appears to be in reference to a possible payment plan for the amounts owed, with March 31, 2010, being the cutoff date for determining the total amount owed under the payment plan.

12

1  stated that the "totals will obviously have to be recalculated

2  before we can talk about payment arrangements" and said that she

3  would make payments on "April 2010 transactions to start anew."[5]

4  (Carol Wright Decl. II Ex. 8; see also Carol Wright Decl. I Ex.

5  8.)

6      Steve Wright states that All Professional took issue

7  with the notices of default because they (1) included amounts

8  owed under the Note and (2) because there were "some questionable

9  amounts included in the calculation of default." (Steve Wright

10 Decl. II ¶ 13; see also Steve Wright Decl. I ¶ 13.) Based on

11 conversations with representatives of Century 21, Steve Wright

12 states that he believed that "Century 21 was working to correct

13 the accounting errors and would be contacting [them] to resolve

14 the issues so [they] could work out a plan to cure the default."

15 (Steve Wright Decl. II ¶ 13; see also Steve Wright Decl. I ¶ 13;

16 Suppl. Steve Wright Decl. ¶ 5.)

17     Shortly after May 17, 2010, when Rodriguez returned

18 from vacation, she and the Wrights spoke again about a possible

19 payment plan. (Suppl. Rodriguez Decl. ¶ 6.) Rodriguez did not

20 agree to provide the Wrights with a revised accounting "because

21 at no time did [she] tell Steve or Carol Wright that any of the

22 amounts Century 21 was seeking to collect under separate

23 franchise agreements were not in fact owed to Century 21." (Id. ¶

24

25     [5]   The evidentiary hearing revealed that while All
   Professional may have resumed paying royalty fees on current
26 transactions, beginning in April of 2010, it still continued to
   fail to pay NAF fees on current transactions. (See Suppl.
27 Rodriguez Decl. in Supp. of Opp'n by Century 21 to Pls.' Mot. for
   P.I. ("Suppl. Rodriguez Decl.") ¶ 10 (No. 2:10-2846, Docket No.
28 19).) Thus, All Professional continued to fall behind on its
   franchise fees.

13

6.)  Rodriguez and the Wrights spoke again in mid-June "to discuss the terms of a possible payment plan of amounts owed by All Professional," but these discussions were not successful, according to the Wrights' testimony and Rodriguez's declaration. (Id. ¶ 10.)  All Professional never did pay the unpaid franchise fees.

In letters dated July 7, 2010, Century 21 terminated the franchise agreements governing the two Sacramento offices, effective July 9, 2010.[6]  (Bertet Decl. Exs. H-I; see also Iuliano Decl. I Exs. G-H.)  The letter regarding the River Park Drive office stated that the account balance was $72,407.97 as of July 6, 2010, an additional $41,667.00 was owed under the Note, and an additional $250,029.34 was owed for lost profits, pursuant to calculations prescribed by the franchise agreement.  The letter regarding the Florin Road office stated that the account balance was $33,934.30 as of July 6, 2010, and an additional $155,671.48 was owed for lost profits.  All Professional was instructed to follow the post-termination procedures, governed by section 16.4[7] of the franchise agreements, which required All

---

[6]    In a May 24, 2010, letter, Century 21 terminated the franchise agreement governing the Folsom office, which All Professional had closed. (Bertet Decl. in Supp. of Opp'n by Century 21 to Pls.' Mot. for P.I. ("Bertet Decl.") Ex. J (No. 2:10-2846, Docket No. 12).)  This termination is not at issue.

[7]    Section 16.4 requires, inter alia, (1) returning of Century 21's property, (2) discontinuing use of Century 21's Marks, (3) discontinuing use of signs or cross arm signposts displaying Century 21's logo, colors, color patterns and designs or Marks, (4) taking any affirmative action necessary to remove any use of Century 21's Marks, (5) "de-identifying" from Century 21 in a manner that does not confuse the public about the fact that they are no longer associated with Century 21, and (6) causing internet sites or web masters to removes Century 21's Marks from their web pages.

14

Professional to cease use of Century 21's trademarks.   Upon
termination of the franchise agreements, Century 21 denied All
Professional access to Century 21's server, e-mail, databases,
and the Preferred Client Club.  (Steve Wright Decl. II ¶ 14;
Carol Wright Decl. II ¶ 13; <u>see also</u> Steve Wright Decl. I ¶ 14;
Carol Wright Decl. I ¶ 14.)

In their declarations, the Wrights claim not to have
anticipated the terminations.  Carol Wright states that, based on
her communications with Rodriguez and Shawn Holland of Century
21:

> I was lead [sic] to believe that we would receive an
> accounting of the actual amounts owed and that we would
> be able to work out a payment plan.  I was ready to cure
> any default once we were provided with a proper
> accounting.  I waited for this accounting.  However, I
> never received an accounting or an adjustment of the
> amounts owed as I had requested.

(Carol Wright Decl. II ¶ 13; <u>see also</u> Carol Wright Decl. I ¶ 14.)
Steve Wright makes a similar statement about waiting for an
accounting.  (Steve Wright Decl. II ¶ 14; Steve Wright Decl. I ¶
14.)

However, the Wrights' testimony and Steve Wright's July
16, 2010, letter, requesting reinstatement show that the
terminations were not unanticipated. (Steve Wright Decl. II Ex.
3; <u>see also</u> Steve Wright Decl. I Ex. 3.)  The letter stated in
pertinent part:

> It was never our intention not to pay Century 21 the
> royalty fees and NAF fees due.  The only part that was in
> contention was the repayment of the Development Advance
> Note.  And it was that point that communications failed.
> . . . We are open to discussion for an acceptable payment
> plan.

Century 21 subsequently denied the request for reinstatement in a

1  letter dated July 29, 2010.  (<u>See</u> Steve Wright Decl. II Ex. 4;

2  <u>see also</u> Steve Wright Decl. I Ex. 4.)  In an August 2, 2010,

3  letter, the Wrights wrote that they were "perplexed" by the

4  denial of the request for reinstatement and were "curious as to

5  what this denial of [their] reinstatement was based on since our

6  message to Shelley was that we were willing to pay what was due

7  Century 21 and that we were willing to sign [Century 21's] note."

8  (Steve Wright Decl. II Ex. 5; <u>see also</u> Steve Wright Decl. I Ex.

9  5.)

10         The purpose of all of these discussions was essentially

11  to see if some kind of alternative payment plan could be worked

12  out between Century 21 and All Professional to relieve All

13  Professional of some of the financial hardship in which it found

14  itself.  All Professional had an obligation to pay the full

15  amount immediately.  Century 21 was not obligated by the

16  agreements or otherwise to enter into these discussions.  Century

17  21 may or may not have proposed a note, but there is no evidence

18  of the terms of a note.  There is only evidence of a discussion.

19  The Wrights' August 2, 2010, letter's reference to a message to

20  Rodriguez about a willingness to sign a note is too vague and

21  came only after Century 21 had terminated the agreements.  The

22  court cannot find any terms of an actual note or an e-mail or a

23  letter with terms to which they agreed.  Beyond the fact that

24  Century 21 did not need to agree to a note, to this day the court

25  cannot find what the terms would be of a note.  The sole reason

26  All Professional did not pay the franchise fees was simply that

27  it could not afford the fees.

28         In late August, Century 21 conducted inspections of the

Sacramento offices to determine whether All Professional had complied with what it believed were All Professional's post-termination obligations under the franchise agreements.  The reports indicated that All Professional continued to use Century 21's trademarks.  (Iuliano Decl. I Exs. K-L; see also Miles Decl. in Supp. Of Century 21's Mot. for P.I. against Defs. ("Miles Decl.") ¶¶ 2-4, Exs. A-C (No. 2:10-2751, Docket No. 11).)  In a September 17, 2010, letter, Century 21's counsel informed Steve and Carol Wright of the results of the post-termination inspections and demanded that they comply with the post-termination franchise agreement obligations (Steve Wright Decl. II Ex. 6; see also Steve Wright Decl. I Ex. 6), to which the Wrights responded with a September 21, 2010, letter, proposing terms under which All Professional would continue to be a franchisee of Century 21.  (Steve Wright Decl. II Ex. 7; see also Steve Wright Decl. I Ex. 7.)

On September 30, 2010, Steve Wright, Carol Wright, and All Professional filed an action in state court against Century 21 for violation of a termination provision of the California Franchise Relations Act ("CFRA"), Cal. Bus. & Prof. Code § 20020, violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, intentional interference with business advantage, breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent interference with business advantage, and interference with contract.  (Notice of Removal Ex. A (No. 2:10-2846, Docket No. 1).)  On October 6, 2010, the state court denied Steve Wright, Carol Wright, and All Professional's ex parte application for a

1  temporary restraining order.  (<u>Id.</u> Ex. J.)  With a pending motion

2  for a preliminary injunction against it, Century 21 removed the

3  action on October 21, 2010.

4        On October 12, 2010, Century 21 filed a separate action

5  in this court against All Professional, Steve Wright, and Carol

6  Wright for claims of federal trademark infringement, 15 U.S.C. §

7  1114, common law trademark infringement, federal unfair

8  competition, 14 U.S.C. § 1125, California statutory trademark

9  infringement, Cal. Bus. & Prof. Code § 14340, violation of the

10 UCL, breach of contract, breach of guaranty, breach of promissory

11 note, account stated, quantum meruit, and accounting.  (No. 2:10-

12 2751, Docket No. 1.)

13       On November 1, 2010, Century 21 filed the instant

14 motion for a preliminary injunction.  (No. 2:10-2751, Docket No.

15 8.)  Century 21 requests that the court enforce the post-

16 termination obligations under the franchise agreements, which

17 include All Professional's cessation of the use of Century 21's

18 trademarks.  On November 19, 2010, Steve Wright, Carol Wright,

19 and All Professional filed the instant motion for a preliminary

20 injunction against Century 21.  (No. 2:10-2846, Docket No. 9.)

21 They request that the court require Century 21 to restore All

22 Professional's benefits under the franchise agreements, including

23 access to Century 21's server, electronic mail, advertisement,

24 property listing services, prospecting databases and the

25 Preferred Client Club, and to enjoin Century 21 from denying All

26 Professional the right to use Century 21's trademarks.

27 II.  <u>Discussion</u>

28       In the Ninth Circuit, "'serious questions going to the

18

merits' and a hardship balance that tips sharply towards the
plaintiff can support issuance of an injunction, so long as the
plaintiff also shows a likelihood of irreparable injury and that
the injunction is in the public interest."  Alliance for the Wild
Rockies v. Cottrell, 622 F.3d 1045, 1053 (9th Cir. 2010).[8]

A.    Merits

The merits of Century 21's claims depend in part on
whether Century 21 properly terminated the franchise agreements.
See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1308 (11th Cir.
1998) ("[W]e find that the Lanham Act's requirement that a
franchisor demonstrate that unauthorized trademark use occurred
to prevail on the merits of a trademark infringement claim
against a franchisee necessitates some type of showing that the
franchisor properly terminated the contract purporting to
authorize the trademarks' use, thus resulting in the unauthorized
use of trademarks by the former franchisee."); S & R Corp. v.
Jiffy Lube Int'l, Inc., 968 F.2d 371, 375 (3d Cir. 1992) ("Once a
franchise is terminated, the franchisor has the right to enjoin
unauthorized use of its trademark under the Lanham Act.  Thus,
Jiffy Lube will merit preliminary injunctive relief if it can
adduce sufficient facts indicating that its termination of
Durst's franchises was proper."); see also Re/Max N. Cent., Inc.
v. Cook, 272 F.3d 424, 430 (7th Cir. 2001).  Termination of a
franchise agreement may be improper under either the terms of the

_____

[8]    To the extent a party seeks a mandatory injunction,
"the district court should deny such relief unless the facts and
law clearly favor the moving party."  Stanley v. Univ. of So.
Cal., 13 F.3d 1313, 1320 (9th Cir. 1994) (internal quotation
marks omitted).

1   agreement or state franchise laws.   See Re/Max N. Cent., 272 F.3d

2   at 430.

3          Section 16.2.3 of the agreements provided that Century

4   21 could terminate the agreement for good cause, which included

5   curable and non-curable defaults.   Section 16.2.4, governing

6   termination for curable defaults, provided that Century 21 could

7   terminate the agreement with 30 days notice of the "proposed

8   termination and the opportunity to cure the breach during the

9   entire notice period, or such longer or shorter notice as is

10  required or permitted by the law of the state where the Office is

11  located," if the curable breach was the failure to pay financial

12  obligations.

13         The CFRA, which the agreements incorporated by

14  reference, prohibits a franchisor from terminating a franchise

15  agreement absent good cause.   Cal. Bus. & Prof. Code § 20020.

16  Good cause includes failure to comply with the franchise

17  agreement "after being given notice thereof and a reasonable

18  opportunity, which in no event need be more than 30 days, to cure

19  the failure."   Id.   Immediate notice of termination without

20  opportunity to cure is permitted when the "franchisee fails to

21  pay any franchise fees or other amounts due to the franchisor or

22  its affiliate within five days after receiving written notice

23  that such fees are overdue."   Id. § 20021(j).

24         Here, it appears from the evidence that Century 21

25  properly terminated the franchise agreements under the terms of

26  the franchise agreements and the CFRA.   Century 21 notified All

27  Professional of its intent to terminate the franchise agreements

28  and the opportunity to cure in April 5, 2010, letters, following

20

prior informal notices of failure to pay amounts due that All
Professional had ignored.  Having not received payment of even
the <u>undisputed</u> fees, Century 21 terminated the Sacramento office
agreements effective July 9, 2010.

It was unequivocally clear from the testimony of the
Wrights that the only reason they did not pay the franchise fees
owed by them to Century 21 was that they did not have the money.
It was not because All Professional did not know the amount to
pay; nor was it because Century 21 had defaulted on its
obligations.  Considering the economy at that time, particularly
in the business of home sales, the court can sympathize with the
Wrights' predicament, but it was simply no excuse for their
failure to pay the fees lawfully owed to Century 21 under the
agreements.

The testimony was that over the period of the franchise
relationship, All Professional paid over $2 million in fees to
Century 21.  Considering that All Professional paid approximately
eight percent of its income in fees, this means that All
Professional made approximately $20 million in income over that
period.  The Wrights knew how important it was to be a Century 21
franchisee.  Each one testified to how crucial it was to be a
Century 21 dealer.  Just to use the trademarks was of
immeasurable value to them, but that was only part of the
benefit.  Century 21 also granted them access to Century 21's
server, e-mail, databases, and the Preferred Client Club.  All
Professional chose not to prioritize the amount it owed to
Century 21 to maintain that privilege.  When the Wrights elected
to pay their other debts ahead of the relatively small percentage

21

1  of their income it would have taken to maintain their Century 21

2  franchise, they made the decision that got them into this

3  situation.

4          Century 21's trademark and unfair competition claims

5  depend only in part on the proper termination of the franchise

6  agreements.  A federal claim for trademark infringement pursuant

7  to section 32 of the Lanham Act also requires (1) ownership of a

8  registered trademark; (2) use of that mark beginning before the

9  alleged infringer's use; (3) the alleged infringer's use without

10 the alleged owner's consent; and (4) that the alleged infringer's

11 use is likely to cause confusion, or to cause mistake, or to

12 deceive.  See 15 U.S.C. § 1114(a); Century 21 Real Estate v.

13 Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1998); Intel Corp. v.

14 Americas News Intel Pub., LLC, No. C 09-05085, 2010 WL 2740063,

15 at *2 (N.D. Cal. July 12, 2010).  The elements of a federal

16 unfair competition claim for false designation of origin of

17 services under section 43(a) of the Lanham Act is identical to

18 the federal trademark infringement claim, with the exception that

19 the trademark need not be registered.  See 15 U.S.C. § 1125(a);

20 Intel Corp., 2010 WL 2740063, at *2.

21         The same "ultimate test" governs both federal claims:

22 "whether the public is likely to be deceived or confused by the

23 similarity of the marks."  Century 21, 846 F.2d at 1178; see also

24 Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 632 (9th Cir.

25 2008).  The "confusion must be probable, not simply a

26 possibility."  Murray v. Cable Nat'l Broad. Co., 86 F.3d 858, 861

27 (9th Cir. 1996).  With respect to California law claims for

28 trademark infringement and unfair competition, courts apply the

same likelihood of confusion test applied to a federal trademark infringement claim. Levi Strauss & Co. v. Toyo Enterp. Co., 665 F. Supp. 2d 1084, 1096 (N.D. Cal. 2009) ("Accordingly, the analysis set forth above under Plaintiff's federal trademark infringement claim applies equally to Plaintiff's trademark and unfair competition claims under California law."); see also Jada Toys, Inc., 518 F.3d at 632 (federal claims for trademark infringement and unfair competition and UCL claim were subject to the same test); CytoSport, Inc. v. Vital Pharma., Inc., 617 F. Supp. 2d 1051, 1066 n.1 (E.D. Cal. 2009) ("Likelihood of confusion is also the test for trademark infringement and unfair competition under California common and statutory law.").

The Ninth Circuit has established eight non-exhaustive factors that are relevant to a likelihood-of-confusion determination: (1) the strength of the alleged owner's trademark; (2) proximity of the goods or services; (3) similarity of the trademarks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods or services and the degree of care likely to be used by the purchaser; (7) alleged infringer's intent in selecting the mark; and (8) likelihood of expansion of the product lines. AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).

Here, the Wrights and All Professional have not argued that All Professional's continued use of Century 21's trademarks is not likely to cause confusion. Nonetheless, the court will apply the Sleekcraft factors. On the similarity factor, All Professional has undisputably continued to use Century 21's trademarks. All Professional has not altered them. See, e.g.,

1  <u>Century 21</u>, 846 F.2d at 1179 (former franchisee argued against
2  likelihood of confusion when it omitted "21" from name).  The
3  court also finds that Century 21's trademarks are strong.  (<u>See</u>
4  Iuliano Decl. I ¶ 6).  In <u>Century 21 Real Estate Corp.</u>, 846 F.2d
5  at 1179, the Ninth Circuit found Century 21's trademarks strong
6  on the facts of that case based in part on the money spent on
7  advertisements containing the trademarks and the revenue
8  generated by use of the trademarks.  <u>Id.</u>

9          While the court has not been presented with actual
10  evidence of confusion, the Wrights' declarations and testimony
11  suggest that All Professional desires to use Century 21's
12  trademarks to attract listings and qualified agents. (Steve
13  Wright Decl. I ¶ 17; Carol Wright Decl. I ¶ 17.)  All
14  Professional uses Century 21's trademarks in connection with real
15  estate brokerage services, the same services offered by Century
16  21's franchisees.  (Iuliano Decl. I ¶¶ 5, 21-22, Exs. K-L; Miles
17  Decl. ¶¶ 2-4, Exs. A-C.)  Lastly, like Century 21 franchisees,
18  All Professional markets its services through signs, business
19  cards, and the internet.  (Iuliano Decl. I ¶¶ 4-6, 21-22, Exs. K-
20  L; Miles Decl. ¶¶ 2-4, Exs. A-C.)  Accordingly, the court finds a
21  likelihood of confusion based on the <u>Sleekcraft</u> factors.  Because
22  it appears from the evidence that Century 21 properly terminated
23  the franchise agreements and that All Professional's continued
24  use of Century 21's trademarks will likely confuse the public,
25  the court finds that it is likely that Century 21 will succeed on
26  its federal and state trademark infringement and unfair
27  competition claims.

28          However, the court does not find the evidence

24

1  sufficient to support an injunction against Century 21 based on

2  All Professional's claims for violation of a termination

3  provision of the CFRA, violation of the UCL, intentional

4  interference with business advantage, breach of contract, breach

5  of the implied covenant of good faith and fair dealing, fraud,

6  negligent interference with business advantage, and interference

7  with contract.

8       B.    Irreparable Harm

9            1.    Century 21

10       Before Winter v. Natural Resources Defense Council,

11  Inc., 555 U.S. 7 (2008), and eBay Inc. v. MercExchange, L.L.C.,

12  547 U.S. 388, 393-94 (2006) (concluding that district courts must

13  apply traditional principles of equity, including assessing the

14  likelihood of irreparable harm, when granting a permanent

15  injunction in the context of patent infringement), courts applied

16  a presumption of irreparable harm upon a showing of a likelihood

17  of success on the merits in intellectual property infringement

18  cases.[9]  See El Pollo Loco, Inc. v. Hashim, 316 F.3d 1032, 1038

19  (9th Cir. 2003) (trademark infringement case); GoTo.Com, Inc. v.

20  Walt Disney Co., 202 F.3d 1199, 1205 n.4 (9th Cir. 2000) (same).

21  Subsequent to and in light of Winter and eBay, some courts

22  declined to apply the presumption.  See, e.g., CytoSport, 617 F.

23  Supp. 2d at 1065 (trademark and trade dress infringement case);

24

25          [9]    In the trademark infringement context, the reason for
26  the presumption "is that once a probability of proving likelihood
    of confusion at trial is shown, the trademark owner's business
27  goodwill and reputation are at risk."  Volkswagen AG v. Verdier
    Microbus and Camper, Inc., No. C 09-00231, 2009 WL 928130, at *6
28  (N.D. Cal. 2009).

1  <u>Volkswagen AG v. Verdier Microbus and Camper, Inc.</u>, No. C

2  09-00231, 2009 WL 928130, at *6 (N.D. Cal. 2009).

3          In <u>Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH &</u>

4  <u>Co.</u>, 571 F.3d 873, 877 (9th Cir. 2009), the Ninth Circuit upheld

5  a district court's application of the presumption in a trademark

6  infringement case.   <u>Id.</u> ("Because the court found a likelihood of

7  success on the merits, it reasonably presumed irreparable injury

8  . . . ."); <u>see also</u> <u>TMX Funding, Inc. v. Impero Techns., Inc.</u>,

9  No. C 10-00202, 2010 WL 2745484, at *7 (N.D. Cal. July 9, 2010)

10 (describing <u>Marlyn</u> as reaffirming the presumption in trademark

11 infringement cases; <u>Protectmarriage.com v. Courage Campaign</u>, 680

12 F. Supp. 2d 1225, 1228 (E.D. Cal. 2010) (explaining in dicta that

13 the presumption applies to trademark infringement cases).  <u>But</u>

14 <u>see</u> <u>Aurora World, Inc. v. Ty Inc.</u>, 719 F. Supp. 2d 1115, 1169

15 (C.D. Cal. 2009) ("The <u>Marlyn</u> court appeared to apply <u>Winter</u> and

16 did not consider the impact of the Supreme Court's decision in

17 <u>eBay</u>.") (copyright infringement case); <u>see also</u> <u>Credit Bureau</u>

18 <u>Connection, Inc. v. Pardini</u>, --- F. Supp. 2d ----, ----, 2010 WL

19 2737128, at *14 (E.D. Cal. July 12, 2010) (finding irreparable

20 harm in a copyright infringement case but citing <u>eBay</u> and

21 declining to presume irreparable harm).

22         In light of the foregoing, the viability of the

23 presumption of irreparable harm caused by trademark infringement

24 is at best still an open question.  Regardless of whether the

25 presumption still applies, in this case it is clear that Century

26 21 will suffer irreparable harm if All Professional is not

27 enjoined from using its trademarks.  While "economic injury alone

28 does not support a finding of irreparable harm, because such

26

injury can be remedied by a damage award," Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991), the Ninth Circuit has recognized that damage to goodwill is an irreparable harm.  Id.  Business goodwill includes a company's reputation. See WMX Techs. v. Miller, 80 F.3d 1315, 1325 (9th Cir. 1996).

It appears obvious from the testimony of Steve Wright and the e-mails and other communications exchanged between the parties (see, e.g., Suppl. Steve Wright Decl. Ex. 12), that Century 21 and All Professional, under the ownership of Steve and Carol Wright, will never be able to resume a relationship of mutual trust and respect.  It is clear to the court that the relationship between the parties has irreparably broken down. For example, on May 13, 2009, Steve Wright went so far as to threaten Century 21 with an action for fraud if Century 21 did not compromise regarding the debt on the Note.  Under the circumstances, to allow All Professional to hold itself out to potential buyers and sellers of real estate as the agent or representative of Century 21 would be only to invite injury to Century 21's good will and reputation.

In CytoSport, 617 F. Supp. 2d at 1080, Judge Damrell pointed out that:

> Trademarks serve as the identity of their owners and in them resides the reputation and goodwill of their owners.  Thus, if another person infringes the marks, that person borrows the owner's reputation, whose quality no longer lies within the owner's control.  A trademark owner's loss of the ability to control its marks, thus, creates the potential for damage to its reputation. [citing Opticians Ass'n of Am. V. Indep. Opticians of Am., 920 F.2d 187, 196 (3rd Cir. 1990).]

2.   <u>Wrights & All Professional</u>

It is also clear to the court that the Wrights and All Professional will likely suffer irreparable injury if they are enjoined from using Century 21's trademarks.  The evidence shows that All Professional has already suffered economic damages by its being denied access to Century 21's System. (Steve Wright II ¶¶ 17-19; Carol Wright II ¶¶ 17-19; Suppl. Steve Wright Decl. ¶ 7.)  It is likely that denying All Professional the right to use Century 21's trademarks would increase the economic harm. Primarily, the System and trademarks attract listings and qualified agents who generate revenue.

However, mere monetary harm is not irreparable harm. <u>Rent-A-Center, Inc.</u>, 944 F.2d at 603; <u>Am. Trucking Ass'ns v. City of L.A.</u>, 559 F.3d 1046, 1057 (9th Cir. 2009); <u>see also Dunkin' Donuts Franchised Restaurants LLC v. KEV Enterps., Inc.</u>, 634 F. Supp. 2d 1324, 1336 (M.D. Fla. 2009) ("While the Court recognizes that Defendants will sustain financial losses if a preliminary injunction issues, that harm is the result of Defendants' failure to comply with the requirements of the Franchise Agreements.  Weighing Defendants' self-inflicted injury against Plaintiffs' immeasurable losses to its hard-earned goodwill, the Court finds the balance of harms weighs decisively in favor of granting the requested relief.").

Nonetheless, intangible injuries that are incapable of measurement, like reputation, recruiting efforts, and goodwill, may constitute irreparable harm.  <u>Rent-A-Center, Inc.</u>, Inc., 944 F.2d at 603.  Century 21's System and trademarks attract qualified agents and All Professional considers Century 21's

28

1  trademarks to be essential to its name "Century 21 All

2  Professional." (See Suppl. Steve Wright Decl. ¶¶ 2-4; Steve

3  Wright Decl. II ¶ 17-18; Steve Wright Decl. I ¶¶ 17-19.)  Thus,

4  whatever the court decides on the pending motions will likely

5  result in irreparable harm to one side in this dispute.

6        C.   Balance of Equities and Public Interest

7             A court looks to the balance of equities and the

8  public interest in deciding whether to issue an injunction.

9  Maxim Integrated Prods., Inc. v. Quintana, 654 F. Supp.2d 1024,

10 1035-26 (N.D. Cal. 2009).  While the court cannot quantify the

11 irreparable harm that will befall each party in this action, the

12 court finds that the public interest weighs heavily in favor of

13 issuing an injunction in favor of Century 21.  In the trademark

14 context, the public interest is usually the right of the public

15 not to be deceived or confused.  See Internet Specialties West,

16 Inc. v. Milon-DiGiorgio Enters., Inc., 559 F.3d 985, 993-94 (9th

17 Cir. 2009); see e.g., CytoSport, 617 F. Supp. 2d at 1080;

18 Moroccanoil, Inc. v. Moroccan Gold, LLC, 590 F. Supp. 2d 1271,

19 1282 (C.D. Cal. 2008).

20            All Professional's continued use of the trademarks

21 will not only falsely represent to the public that All

22 Professional is a Century 21 broker in the good graces of its

23 franchisor, but will also deceive the public into believing that

24 All Professional enjoys all the tools, resources, and systems

25 normally provided by Century 21 to its franchisees.  Preventing

26 such deception is strongly in the public interest.

27            Accordingly, the court will grant Century 21's motion

28 for a preliminary injunction and deny the Wrights' and All

                              29

1  Professional's motion for a preliminary injunction.

2          Century 21 has requested that the court enforce All

3  Professional's post-termination obligations under the

4  agreements, which exceed cessation of the use of Century 21's

5  trademarks.  Such an injunction would not be necessary to

6  preserve the status quo in this case, and the court accordingly

7  will not order such relief in this preliminary injunction.  The

8  court will only enjoin the Wrights and All Professional from

9  further unauthorized use of Century 21's Marks, as defined under

10  the franchise agreements.  Such injunction should be sufficient

11  to ensure that the public does not mistakenly believe that All

12  Professional is a Century 21 franchisee.

13          D.   Bond

14          Rule 65(c) of the Federal Rules of Civil Procedure

15  provides that:

16          The court may issue a preliminary injunction . . . only
            if the movant gives security in an amount that the
17          court considers proper to pay the costs and damages
            sustained by any party found to have been wrongfully
18          enjoined or restrained.

19

20  The parties have not addressed the amount of bond to be posted.

21  From the record presently before the court it is impossible to

22  quantify the damages All Professional may sustain as a result of

23  this injunction.  From the testimony, however, it appears that

24  they are likely to be substantial.  The court considers a bond

25  in the sum of $100,000 to be appropriate under the

26  circumstances.

27          IT IS THEREFORE ORDERED that:

28          (1) Steve Wright, Carol Wright, and All Professional's

30

motion for a preliminary injunction be, and the same hereby is, DENIED; and

(2) Century 21's motion for a preliminary injunction be, and the same hereby is, GRANTED.  Pending final hearing on the merits of the parties' claims, or until otherwise ordered by this court, Steve Wright, Carol Wright, and All Professional are HEREBY ENJOINED from further unauthorized use of Century 21's Marks, as defined in the franchise agreements.  This preliminary injunction shall become effective upon the posting by Century 21 of valid security in the amount of $100,000.

IT IS SO ORDERED.

DATED:  January 21, 2011

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE