1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

                             ----oo0oo----

11

12  CENTURY 21 REAL ESTATE LLC, a
    Delaware Limited Liability
13  Company formerly known as
    Century 21 Real Estate            NOS. CIV.  2:10-2751 WBS GGH
14  Corporation,                                 2:10-2846 WBS GGH
                                                 2:11-2497 WBS GGH
15                                               CONSOLIDATED
             Plaintiff,
16                                     MEMORANDUM & ORDER RE: CENTURY
         v.                            21'S MOTION FOR SUMMARY
17                                     ADJUDICATION
    ALL PROFESSIONAL REALTY, INC.,
18  a California corporation doing
    business as CENTURY 21 ALL
19  PROFESSIONAL; STEVEN M.
    WRIGHT, an individual; and
20  CAROL WRIGHT, an individual,

21           Defendants.
    _____/
22
                             ----oo0oo----
23

24          Century 21 Real Estate LLC ("Century 21") filed an

25  action against All Professional Realty, Inc. ("All

26  Professional"), Steven M. Wright, and Carol Wright arising from

27  All Professional's continued use of Century 21's trademarks

28  following the terminations of real estate brokerage franchise

                                 1

1   agreements for unpaid fees.  (No. 2:10-2751.)  Steve Wright,[1]

2   Carol Wright, and All Professional filed a related action against

3   Century 21 arising from the franchise agreements.  (No.

4   2:10-2846.)  Century 21 filed a third action against All

5   Professional Hawaii Realty Inc. ("All Professional Hawaii"), John

6   Sherman, Steve Wright, and Carol Wright arising from All

7   Professional Hawaii's allegedly wrongful use of Century 21's

8   trademarks following the termination of another real estate

9   brokerage franchise agreement.  (No. 2:11-2497.)  All three of

10  these cases have been consolidated.  Presently before the court

11  is Century 21's motion for summary adjudication pursuant to

12  Federal Rule of Civil Procedure 56.

13  I.   Factual and Procedural Background

14       In 1994, Steve and Carol Wright formed All

15  Professional, a real estate brokerage company.  (Compendium of

16  Exhibits Ex. 42 ("Steve Wright Dep. I") at 12:13-22 (Docket No.

17  106)[2]; Steve Wright Decl. in Opp'n to Century 21's Mot. for

18  Prelim. Injunction ("Steve Wright Decl.") ¶ 2 (Docket No. 18-2).)

19  All Professional signed its first franchise agreement with

20  Century 21 in 1995, which allowed it to operate an office under

21  the name "Century 21 All Professional."  (Steve Wright Dep. I at

22  20:3-23; Steve Wright Decl. ¶ 3.)  Century 21 is a franchisor of

23  real estate brokerages.  (Bertet Decl. ¶ 3 (Docket No. 88-4).)

24

25       [1]   The parties use "Steve Wright" and "Steven M. Wright."
    Because he is captioned as Steve Wright in the action initiated
26  by him, the court will use Steve Wright.

27       [2]   Except where otherwise noted, all citations to the
    docket refer to case number 10-2751, into which all three cases
28  were consolidated.

A.   Franchise Agreements

All Professional[3] operates multiple offices and each office is governed by a separate franchise agreement with Century 21.  In November of 2005, All Professional signed three ten-year franchise agreements with Century 21 for two offices in Sacramento[4] and one office in Folsom, California, with an effective date of December 1, 2005, for each franchise agreement. (Bertet Decl. Exs. A-C §§ 1.5, 1.7.)  The Wrights also signed a personal guaranty of All Professional's obligations under the three California franchise agreements.  (Id. Exs. A-C at 43-44.)

Shortly after signing the franchise agreements for the California franchises, the Wrights and their business partner John Sherman, on behalf of All Professional Hawaii, signed a ten-year franchise agreement with Century 21 for the operation of an office in Honolulu, Hawaii.  (Id. ¶ 6, Ex. D.)  The Wrights, together with Sherman, again signed a personal guaranty for All Professional Hawaii's obligations under the Hawaii franchise agreement.  (Id. Ex. D at 43-44.)

All four franchise agreements include the same relevant language.  Section 4.1 of the franchise agreements granted All Professional a nonexclusive license to use Century 21's "Marks" and "System."  (Id. Exs. A-D § 4.1.)  "Marks" meant Century 21's trademarks, service marks, and trade dress.  (Id. Exs. A-D

---

[3]   The court will refer to All Professional, All Professional Hawaii, Steve Wright, and Carol Wright collectively as "All Professional."

[4]   When referring to the Sacramento franchise agreements individually, the court will reference the franchise by the street on which it is located -- River Park and Florin Road.

§ 3.1.8.)  "System" meant, <u>inter alia</u>, "policies, procedures, and techniques designed to enable [] offices to compete more effectively in the real estate sales market."  (<u>Id.</u> Exs. A-D § 3.1.14.)  Century 21's "system" also included "common use and promotion of certain Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales management training programs." (<u>Id.</u>)

Century 21 has numerous registered trademarks.  (<u>See</u> Iuliano Decl. ¶ 3, Ex. A (Docket No. 88-3).)  According to Century 21, it uses the trademarks on goods and in advertisements, education, training manuals, newsletters, global computer networks, and residential, commercial, and mortgage brokerage services.  (Id. ¶ 5.)  The trademarks have become well recognized because of advertisements and promotions of goods and services offered by Century 21.  (Id.)

In exchange for the rights granted under the franchise agreements, All Professional agreed to pay royalty fees of six percent of gross revenue, with an initial monthly minimum fee of $500.00.  (Bertet Decl. Exs. A-D §§ 7-8.)  All Professional also agreed to pay two percent of its gross revenue to a National Advertising Fund ("NAF") for advertising expenses, with an initial monthly minimum fee of $562.00.

Section 16.2.3 of the franchise agreements provided that Century 21 could terminate the agreement for good cause, including curable and non-curable defaults by All Professional. (Id. Exs. A-D § 16.2.3.)  Section 16.2.4, governing termination for curable defaults, provided that Century 21 could terminate the agreement with 30 days notice of the "proposed termination

4

and the opportunity to cure the breach during the entire notice
period, or such longer or shorter notice as is required or
permitted by the law of the state where the Office is located,"
if the curable breach was the failure to pay financial
obligations.  (<u>Id.</u> Exs. A-D § 16.2.4.)  Section 16.2.5 provided
that Century 21 could terminate the agreement without notice if
termination was based on any non-curable defects.  (<u>Id.</u> Exs. A-D
§ 16.2.5.)  Non-curable defects included abandonment of an office
demonstrated by, among other things, a franchisee's failure to
operate at an approved location for five consecutive business
days.  (<u>Id.</u> Exs. A-D § 16.2.5.4.)

The agreements also contained language stating that
they were integrated agreements and that the franchisee should
not sign the agreement if any representative of Century 21
promised something that was not part of the agreement, an
attached addendum, or the offering circular.  (<u>Id.</u> Exs. A-D
§ 22.15.)  The agreements further stated that the success of the
franchise was dependant on the efforts of the franchise owners
and that neither Century 21 nor any other person "guaranteed or
warranted that you will succeed in the operation of the
Franchise, or has provided any sales or income projections of any
kind to you."  (<u>Id.</u> Exs. A-D § 23.9.)  Finally, the agreements
provided that Century 21 would "have no right to regulate or
participate in the recruitment, selection, engagement, retention,
discipline or termination of your sales associates or employees,
except as may be necessary to protect the Marks and goodwill" and
that defendants were "solely responsible for the conduct of the
Business operated under this Agreement according to [their] own

judgment, and in accordance with the provisions of this Agreement
and the P&P Manual . . . ." (Id. Exs. A-D § 21.2.)

      B.   Development Advance Promissory Note

        In addition to entering into the California franchise
agreements in November of 2005, All Professional borrowed
$75,000.00 from Century 21 pursuant to a Development Advance
Promissory Note ("DAN" or "Note") for which the Wrights signed a
personal guaranty. (Bertet Decl. Ex. D.)  The Note provided for
a long-term, annual repayment plan and provided that if All
Professional was not in breach of its franchise agreements, the
yearly amount due would be forgiven if All Professional reached
certain gross revenue annual thresholds. (Id.)  If the revenue
thresholds were not met, the Note stated that "an amount of
Principal equal to the Yearly Principal shall become due and
payable." (Id.)  In the event that All Professional terminated
its business or defaulted on "any other agreement or note"
between the parties, the DAN provided for an acceleration of the
unpaid principal. (Id.)  In addition to the Note, All
Professional and the Wrights signed a Security Agreement in which
they granted Century 21, as security for the prompt payment of
the Note, a security interest in certain specifically described
collateral. (Id. ¶ 20, Ex. F.)

        The Wrights state that they executed the Note relying
on statements by Dale Omer, Century 21's Western Regional Vice
President, that "everything would be wonderful." (Steve Wright
Dep. I at 62:1-6.)  According to the Wrights, Omer told them "not
to worry" about repaying the DAN because the new "tools and
systems" that Century 21 would provide would "revolutionize

[Century 21] offices compared to the competition" and make All Professional more profitable.  (Id. at 59:19-60:2; 62:13-15.) Despite these representations, Steve Wright concedes that he does not "believe they ever said that we would be profitable.  They said we would be more productive and sell more houses."  (Id. at 67:11-15.)

  C. Addenda to Franchise Agreements and Waiver of Claims

   All Professional signed an addendum to the River Park franchise agreement, effective January 3, 2006, which amended the franchise agreement to include section 25.4 pertaining to the DAN.  (Bertet Decl. ¶ 22, Ex. G § 25.4.)  The addendum provided that "in the event of any termination of this agreement for any reason prior to the expiration of the Term . . . any and all sums due and owing (and/or not otherwise previously forgiven) under the Development Advance Note may be accelerated (at Franchisor's discretion) and shall be immediately payable."  (Id.)

   All Professional also signed addenda to the other two California franchise agreements that did not relate to the DAN. All three addenda contained a limited waiver of claims from which All Professional and the Wrights agreed to expressly release Century 21 from, and forever waive and relinquish, any and all claims they might have against Century 21, as well as a waiver of All Professional and the Wrights' rights under section 1542 of the California Civil Code.  (Id. ¶ 22, Ex. G at 115.)  All Professional and the Wrights also signed an addendum to the Hawaii franchise, effective February 1, 2006, which contains a similar waiver of claims.  (Id. ¶ 24, Ex. H at § 5.)

  D. Improper Recruiting Practices

7

Beginning in late 2006, All Professional argues that Century 21 All Islands, another Century 21 franchise office located in Hawaii, was engaged in an aggressive campaign to recruit All Professional Hawaii's agents in violation of Century 21's "Code of Conduct."[5]  Steve Wright informed Sandy Persky, Century 21's Regional Director assigned to Hawaii, about All Islands' recruiting violations in an email dated December 19, 2006. (Compendium of Exhibits Ex. 16 at CENT002539 (Docket No. 104).)[6]  On July 20, 2007, Steve Wright sent a second email to Persky, Omer, and Bob Popp at Century 21 complaining about All Islands' recruiting practices.[7]  (Id. Ex. 16 at CENT002538.) This second email specified that All Professional did not expect Century 21 to take any actions based on the complaint.  (Id.) The email chain following Steve Wright's second complaint suggests that as of July 25, 2007, Century 21 had not done

---

[5]     Century 21's Policies and Procedures Manual stated that franchisees "should avoid" recruiting sales associates of other franchisees and "advised that aggressive sales associates recruiting practices may subject the broker involved to claims of business interference by other brokers under applicable state law."  (Steve Wright Decl. Ex. 2.)

[6]     The court notes that although All Professional did inform Century 21 about the alleged recruiting violations, the email also stated that All Professional was "OK with [the recruiting violation] being 'OK'," that it did not expect the practice to stop given All Islands' past recruiting practices, and that All Professional would be "actively recruiting All Island agents" in retaliation.  (Compendium of Exhibits Ex. 16 at CENT002539.)

[7]     Although this email contained complaints regarding All Islands practices, it also specifically stated that All Professional would "remove any restrictions Century 21 All Professional has against All Island's [sic] recruiting [its] agents" and had "added All Island agents into our recruiting pool."  (Compendium of Exhibits Ex. 16 at CENT002538.)

1  anything regarding All Islands' alleged recruiting violations.
2  (Id.)

3        On April 18, 2008, Steve Wright sent Persky an
4  additional email with attachments documenting All Islands'
5  recruitment efforts.  (Id. Ex. 17.)  Persky forwarded the email
6  to Popp.  (Id.)  Popp contacted the All Islands broker and
7  suggested that he stop recruiting All Professional Hawaii's
8  agents.  (Compendium of Exhibits Ex. 46 ("Popp Dep. I") at 59:9-
9  60:18 (Docket No. 108).)  On May 7, 2008, Steve Wright notified
10 Persky and Popp that he was resigning from the Hawaii Broker
11 Counsel because of All Islands' recruitment practices.
12 (Compendium of Exhibits Ex. 18 (Docket No. 104).)

13       Beginning in 2008, a number of All Professional's
14 agents from its California franchises left to work at Century 21
15 Select.  (Steve Wright Dep. I at 142:21-143:14.)  Based on
16 conversations with the agents, Steve Wright believed that Select
17 was improperly recruiting his agents, in part by offering them
18 commissions that would result in a net loss to Select.  (Id. at
19 146:11-147:18; see also Compendium of Exhibits Ex. 40 (agent
20 compensation information from Century 21 Select).)  Steve Wright
21 also claims that at least two of All Professional's former agents
22 stole commission checks from All Professional and cashed them
23 after they transferred to Select.  (Steve Wright Dep. I at 155:5-
24 16, 157:5-22.)  Steve Wright informed Century 21 that other
25 franchisees were "openly competing with All Professional and
26 stealing its business and employees" in violation of Century 21's
27 "Code of Conduct."  (Steve Wright Decl. ¶ 9.)  Popp acknowledges
28 receipt of an email from All Professional complaining about

1  stolen commissions, but did not take any action regarding the

2  complaint.  (Popp Dep. I at 72:16-73:3.)

3         On August 4, 2008, Steve Wright informed Century 21

4  that he would no longer participate in Broker Council activities

5  for the Sacramento area due to Century 21's "policy of allowing

6  Select, All Islands, Homefinders to recruit our agents/staff

7  . . . ."  (Compendium of Exhibits Ex. 19 (Docket No. 104).)

8         E.   Protection of Century 21 Trademark

9         All Professional also argues that Century 21 allowed

10 other businesses to dilute the Century 21 trademark in All

11 Professional's area when two real estate offices not affiliated

12 with Century 21, moved into the Folsom area operating as "21st

13 Century Realty" and "First Century."  (Steve Wright Dep. I at

14 116:6-117:16, 234:14-235:23.)  Steve Wright states that he

15 petitioned Popp to have Corporate take action against the

16 trademark infringement in 2004 or 2005.[8]  (Id. at 235:13-25.)

17 Steve Wright reports that Popp responded that "there was nothing

18 he was going to be able to do, that we just had to deal with it."

19 (Id. 116:17-23.)

20        All Professional argues that Century 21 took no

21 substantive action on the trademark issue until after All

22 Professional moved out of the Folsom office and Century 21 Select

23

24        [8]    Popp states that he was not working for Century 21 in
   2004 or 2005, but actually began his position as Vice President
25 with Century 21 in 2006.  (Rudin Decl. Ex. F. ("Popp Dep. II") at
   9:4-25, 17:14-16 (Docket No. 88-10).)  Popp does not recall
26 meeting the Wrights until 2007.  (Id. at 23:19-23.)  In Steve
   Wright's second deposition, held six months after the first, he
27 clarifies that he probably first spoke with Popp regarding the
   trademark issue in 2006.  (Compendium of Exhibits Ex. 43 ("Steve
28 Wright Dep. II") at 33:20-22 (Docket No. 107).)

1  moved into the office.  (Steve Wright Dep. I at 235:2-12.)  After

2  All Professional's franchise was terminated on October 8, 2010,

3  Century 21's legal counsel sent Henry Ung from 21st Century

4  Network, one of the non-affiliated offices, written notification

5  that 21st Century Network was in violation of Century 21's

6  trademark and demanded that it cease using the marks or face

7  further legal action.  (Compendium of Exhibits Ex. 39 (Docket No.

8  105).)

9       F.   Folsom Office

10       In late August 2009, All Professional ceased doing

11  business out of its Folsom office. (Steve Wright Dep. I at 201:6-

12  11.)  The office closure occurred after the building was

13  foreclosed upon, either due to a partnership break-up between All

14  Professional and a separate entity, (Steve Wright Dep. II at

15  27:14-29:5), or because All Professional was struggling

16  financially after agents left and its income dropped, (Steve

17  Wright Dep. I at 201:12-21).  All Professional did not seek

18  approval from Century 21 prior to closing the Folsom office.

19  (Id. at 201:22-202:2.)

20       On October 27, 2009, Century 21 inquired as to the

21  status of All Professional's Folsom office.  (Compendium of

22  Exhibits Ex. 24 (Docket No. 104).)  All Professional responded

23  that it was relocating the Folsom office and "expect to be fully

24  operational the first of the year."  (Id.)  All Professional also

25  stated that it would advise Century 21 when the new address was

26  finalized.  (Id.)

27       In February 2010, Mike Bainbridge, a Century 21

28  business consultant, suggested that All Professional merge its

11

Folsom office with its Sacramento office in order to avoid paying minimum monthly fees on the Folsom office that was not currently operating. (Compendium of Exhibits Ex. 48 ("Bainbridge Dep.") at 106:16-107:8 (Docket No. 110); Steve Wright Dep. I at 203:19-204:13.) All Professional did not elect to consolidate the offices.

On February 5, 2010, Dan Jacuzzi, the owner of Century 21 Select, emailed Marc Fischman at Century 21 about opening up a Century 21 Folsom office at the same location that All Professional had abandoned. (Compendium of Exhibits Ex. 25 at CENT004385 (Docket No. 104).) Before opening up a Folsom location, however, Jacuzzi wanted to "insure [sic] that the prior (now closed) franchise of All Professional be terminated." (Id.) On February 11, 2010, Bainbridge sent Jacuzzi an application for the new Folsom office and stated that he was "working on the other half of the request and will keep you posted as to how that progresses." (Id. at CENT004275.)

On May 24, 2010, Century 21 sent All Professional notice that it had terminated All Professional's Folsom office on the grounds of abandonment. (Compendium of Exhibits Ex. 31 (Docket No. 105).) On May 26, 2010, Century 21 approved Jacuzzi's application to open an office in Folsom using the building that All Professional had vacated. (Compendium of Exhibits Ex. 47 ("Popp Dep. III") at 13:24-14:15, 22:5-10 (Docket No. 109).) All Professional argues that Century 21's termination of its Folsom office was the result of Century 21 favoring Select over All Professional.

G.   <u>Failure to Pay Century 21 Franchise Fees</u>

1        Beginning in May of 2009, All Professional stopped

2  paying many of its franchise fees.  (Bertet Decl. ¶ 25.)  All

3  Professional was aware that it had failed to pay the fees.

4  Century 21's online system provides its franchisees with

5  "detailed summaries of their account balances owed to Century 21,

6  including specific information detailing the amounts owed by that

7  franchisee, when the amounts are due, and the type of amount due

8  (i.e., royalty fee, national advertising fee fund fee,

9  Development Advance Note, etc.)[.]"  (Id. ¶ 30.)

10       During and prior to this period, All Professional also

11  failed to meet its annual thresholds requirement and thus annual

12  DAN payments for 2007, 2008, and 2009 were not forgiven.  When

13  Century 21 approached All Professional regarding payment of the

14  DAN fees, Century 21 offered to waive the payment in exchange for

15  a one-year extension of each franchise agreement and a general

16  release of claims.  (Compendium of Exhibits Ex. 23 (Docket No.

17  104).)  All Professional rejected Century 21's proposal and

18  instead offered a counterproposal of a 15-day extension of the

19  franchise agreement.  (Id.)  Steve Wright later also proposed

20  that Century 21 have "Select fire the 8 agents he [Jacuzzi] has

21  bought and Homefinders fire the 5 agents they have allowed John

22  Sherman to recruit."  (Id.)  Century 21 rejected the

23  counteroffers.  (Id.)  Thereafter, All Professional failed to

24  make any payments on the Note.

25     H.   Termination of Franchises

26       In four separate letters dated April 5, 2010, Century

27  21 notified All Professional of its intent to terminate the four

28  franchise agreements and of All Professional's opportunity to

13

1    cure.   (Bertet Decl. Exs. I-L.)   The notice pertaining to the

2    River Park Drive office stated in pertinent part:

3         Century 21 has advised you on numerous occasions that you
          are delinquent in the payment of your account.   Upon
4         review, we have determined that you are in default of the
          above-referenced Agreement for failing to pay fees when
5         due.   Your default constitutes a material breach of the
          Agreement, for which Century 21 may terminate the
6         franchise.

7         As of February 24, 2010, your account balance for this
          office was $59,327.41.
8
          In order to avoid termination, you must pay the balance
9         in full no later than May 10, 2010.

10   (Id. Ex. I.)   The notice also provided contact information for

11   Jacqueline Bertet, Century 21's Senior Director of Financial

12   Services, and informed All Professional that failure to pay the

13   balance would result in immediate termination of the franchise,

14   which would require All Professional to pay the amount past due

15   at the time of termination, sums assessed in a post-termination

16   audit, the remaining balance of the Note, and lost profits.

17   (Id.)   The notice pertaining to the Florin Road, Sacramento,

18   office contained similar language and stated that the balance was

19   $23,492.69 as of February 24, 2010.   (Id. Ex. K.)   The notice

20   pertaining to the Folsom office contained similar language and

21   stated that the balance was $13,274.34 as of February 24, 2010.

22   (Id. Ex. J.)   The notice pertaining to the Honolulu office

23   contained similar language and stated that the balance was

24   $14,813.76.   (Id. Ex. L.)   All four notices required payment by

25   May 10, 2010.

26        In the month following receipt of the April 5, 2010,

27   notices, neither Steve nor Carol Wright called representatives of

28   Century 21.   Carol Wright initially called Shalina Rodriguez, a

                                    14

Director of Financial Services for Century 21, on May 6, 2010. (Compendium of Exhibits Ex. 44 ("Carol Wright Dep.") at 201:22-203:21, 206:4-16 (Docket No. 107).)  Carol Wright states that in the telephone call she asked for an accounting and "disputed certain discrepancies I saw in the notices of default."  (Carol Wright Decl. ¶ 12.)  Carol Wright "specifically asked what would be required to resolve the claimed default":

> [Rodriguez] informed me that we would need to pay $124,432.20 and that Corporate would want a promissory note since the figure was greater than $100,000.  Our discussion revealed that Corporate was including the outstanding amount allegedly owed under [the Note], even though payment was not required under any of the Franchise Agreements.  The pay-off amount included the Hawaii office even though that franchise was owned by a separate entity.

(Suppl. Carol Wright Decl. in Supp. Of Pls.' Mot. for P.I. ("Suppl. Carol Wright Decl.") ¶ 4 (No. 2:10-2846, Docket No. 13).)

        The day after the phone conversation, Carol Wright emailed a letter to Rodriguez identifying the following "items we need to address before proceeding": (1) removing minimum royalty and NAF fees from the Folsom office account balance because it had been closed since August 31, 2009; (2) determining the cutoff date for "final payment calculations," with a possible date of March 31, 2010;[9] (3) "handling" the Hawaii office separately; (4) removing minimum royalty and NAF fees from January, February, and March of 2010; (5) separating the Note amount owed because of a "separate issue" as to why All Professional was not paying it;

---

        [9]    This appears to be in reference to a possible payment plan for the amounts owed, with March 31, 2010, being the cutoff date for determining the total amount owed under the payment plan.

and (6) crediting $304.50 because of a Century 21 error.
(Compendium of Exhibits Ex. 29 (Docket No. 104).)   Lastly, Carol
Wright stated that the "totals will obviously have to be
recalculated before we can talk about payment arrangements," and
said that she would make payments on "April 2010 transactions to
start anew."[10]   (Id.)

Century 21 accounting guidelines allowed for account
managers and directors to arrange alternative payment plans with
Century 21 franchisees who were behind on their payments.
(Compendium of Exhibits Ex. 45 ("Bertet Dep.") at 26:17-28:14
(Docket No. 108).)   Under these guidelines, franchises with less
than $100,000 in debt could be offered a deal point agreement (a
type of note) and franchises with over $100,000 in debt could be
offered an interest bearing note to help them pay off their
debts.   (Id. at 26:17-28:25.)   Based on their course of dealings
with Century 21, the Wrights believed that they would be offered
a payment plan to cure their default.   (Carol Wright Dep. at
200:7-201:4.)

On June 16, 2010, the Wrights participated in a
conference call with account managers Rodriguez and Shawn
Holland.   (Id. at 22:4-14.)   During the call, the parties
discussed changing the official closing date for the Folsom
office in order to reduce minimum fees during that period.   (Id.
at 222:5-8.)   In an email dated June 17, 2010, Holland reported

_____

[10]   While All Professional may have resumed paying royalty
fees on current transactions beginning in April of 2010, it still
continued to fail to pay NAF fees on current transactions.
(Carol Wright Dep. at 208:17-25.)   Thus, All Professional
continued to fall behind on its franchise fee payments.

16

that during the call "we managed to resolve her dispute except for the DAN money.  We are hoping to resolve that matter soon and prepare 2 separate Deal Point Agreements (one for the Hawaii office)." (Compendium of Exhibits Ex. 32 (Docket No. 105).)  An agreement on DAN payments was never reached and Deal Point Agreements were not issued.

In letters dated July 7, 2010, Century 21 terminated the franchise agreements governing the two Sacramento offices and the Hawaii office, effective July 9, 2010.[11]  (Bertet Decl. Exs. N-P.)  The letter regarding the River Park Drive office stated that the account balance was $72,407.97 as of July 6, 2010, an additional $41,667.00 was owed under the Note, and an additional $250,029.34 was owed for lost profits, pursuant to calculations prescribed by the franchise agreement.  (Id. Ex. N.)  The letter regarding the Florin Road office stated that the account balance was $33,934.30 as of July 6, 2010, and an additional $155,671.48 was owed for lost profits.  (Id. Ex. O.)  The letter regarding the Hawaii office stated that the account balance was $21,898.08 as of July 6, 2010, and an additional $80,541.98 was owed for lost profits.  (Id. Ex. P.)  All Professional was instructed to follow post-termination procedures and cease using Century 21's trademarks.  (See id. Exs. N-P.)  The procedures were more fully described in section 16.4 of the franchise agreements.[12]  Upon

_____

[11]    The Folsom franchise had previously been terminated for abandonment pursuant to Century 21's May 24, 2010, letter. (Compendium of Exhibits Ex. 31.)

[12]    Section 16.4 requires, inter alia, that franchises (1) return Century 21's property, (2) discontinue use of Century 21's Marks, (3) discontinue use of signs or cross arm signposts displaying Century 21's logo, colors, color patterns and designs

termination of the franchise agreements, Century 21 denied All Professional access to Century 21's server, email accounts, databases, and the Preferred Client Club. (Steve Wright Decl. ¶ 14; Carol Wright Decl. ¶ 13.)

The Wrights claim not to have anticipated the terminations. Carol Wright states that, based on her communications with Rodriguez and Holland of Century 21:

> I was lead [sic] to believe that we would receive an accounting of the actual amounts owed and that we would be able to work out a payment plan. I was ready to cure any default once we were provided with a proper accounting. I waited for this accounting. However, I never received an accounting or an adjustment of the amounts owed as I had requested.

(Carol Wright Decl. ¶ 13.) Steve Wright claims that they were prepared to pay off their debts with Century 21 as soon as a number was finalized. (Steve Wright Dep. at 222:10-223:7.) The Wrights' willingness to pay off their account balance appears limited to their willingness to sign a new promissory note with Century 21. (See, e.g., id. at 222:14 ("We were prepared to sign a Note.").) During the court's January 11, 2011, evidentiary hearing on a preliminary injunction for this matter, both Carol and Steve Wright stated that they did not have the cash on hand to pay off their account balance. (See, e.g., Jan. 11, 2011, Tr. at 61:1-3, 70:11-14 ("THE COURT: And the reason you didn't pay for those earlier months is because you didn't have that kind of money, right?  THE WITNESS: Not in that volume, no sir."), 80:10-

---

or Marks, (4) take any affirmative action necessary to remove any use of Century 21's Marks, (5) "de-identify[]" from Century 21 in a manner that does not confuse the public about the fact that they are no longer associated with Century 21, and (6) remove Century 21's Marks from their web pages.

81:17.)  All Professional now presents bank statements suggesting that it had approximately $150,000 in its bank accounts in May 2010.  (Compendium of Exhibits Ex. 30 (Docket No. 104).)

All Professional also argues that the termination of its franchises took Century 21 employees by surprise.  A July 12, 2010, email from Popp states that he "thought we were getting close on a deal."  (Compendium of Exhibits Ex. 34 (Docket No. 105).)  In response, however, Bainbridge replied, "We're only close on a deal if we're willing to forgive the DAN payments due because he lost those agents to Select."  (Id.)

Following receipt of the July 7, 2010, termination letters, the Wrights sent Century 21 a letter dated July 16, 2010, asking that Century 21 reconsider the termination.  The letter stated "It was never our intention not to pay Century 21 the royalty fees and NAF fees due.  The only part that was in contention was the repayment of the Development Advance Note.  And it was at that point that communications failed."  (Id. Ex. 35.)  Century 21 subsequently denied All Professional's request for reinstatement in a letter dated July 29, 2010.  (Id. Ex. 38.)  In an August 2, 2010, letter, the Wrights wrote that they were "perplexed" by the denial of their request for reinstatement and were "curious as to what this denial of [their] reinstatement was based on since our message to [Rodriguez] was that we were willing to pay what was due Century 21 and that we were willing to sign [Century 21's] note." (Steve Wright Decl. Ex. 5.)

I.   Continuing Use of Century 21 Trademarks

In late August, Century 21 conducted inspections of the Sacramento offices to determine whether All Professional had

19

complied with what it believed were All Professional's post-termination obligations under the franchise agreements.  The reports indicated that All Professional continued to use Century 21's trademarks.  (Bertet Decl. Exs. V-X.)  In a September 17, 2010, letter, Century 21's counsel informed Steve and Carol Wright of the results of the post-termination inspections and demanded that they comply with the post-termination franchise agreement obligations, (Steve Wright Decl. Ex. 6), to which the Wrights responded with a September 21, 2010, letter, proposing terms under which All Professional would continue to be a franchisee of Century 21.  (Id. Ex. 7.)

All Professional continued to use Century 21's trade dress until after the court issued its preliminary injunction order on January 24, 2011.  On February 11, 2011, All Professional filed a Notice of Appeal of the court's order. (Docket No. 34.)  On February 23, 2011, the court denied All Professional's Request for Stay and in open court encouraged the parties to agree to a time table for All Professional to de-mark its offices.  (Docket No. 41.)  In a stipulation dated March 8, 2011, the parties agreed that All Professional would have until April 1, 2011, to cease using Century 21's marks on buildings and would cover up Century 21's marks on yard signs by May 1, 2011. (Compendium of Exhibits Ex. 41 (Docket No. 105).)

J.    Present Litigation

On September 30, 2010, Steve Wright, Carol Wright, and All Professional filed an action in state court against Century 21 for violation of a termination provision of the California Franchise Relations Act ("CFRA"), Cal. Bus. & Prof. Code § 20020,

violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, intentional interference with business advantage, breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent interference with business advantage, and interference with contract.  (Notice of Removal Ex. A (No. 2:10-2846, Docket No. 1).)  On October 6, 2010, the state court denied Steve Wright, Carol Wright, and All Professional's ex parte application for a temporary restraining order.  (Id. Ex. J.)  With a pending motion for a preliminary injunction against it, Century 21 removed the action to federal court on October 21, 2010.

On October 12, 2010, Century 21 filed a separate action in this court against All Professional, Steve Wright, and Carol Wright for claims of federal trademark infringement, 15 U.S.C. § 1114, common law trademark infringement, federal unfair competition, 14 U.S.C. § 1125, California statutory trademark infringement, Cal. Bus. & Prof. Code § 14340, violation of the UCL, breach of contract, breach of guaranty, breach of promissory note, account stated, quantum meruit, and accounting.  (Docket No. 1.)

On December 22, 2010, Century 21 filed an additional action against Steve Wright, Carol Wright, and All Professional Hawaii in Morris County, New Jersey, for claims of trademark infringement, 15 U.S.C. § 1114, false designation of origin/ false advertising, 15 U.S.C. § 1125(a), trademark dilution, 15 U.S.C. § 1125(c), common law unfair competition, breach of contract, breach of guaranty, accounting, and unjust enrichment. (No. 11-2497, Docket No. 1-1.)  All Professional removed the

21

1  action to federal court on the basis of diversity jurisdiction

2  and Century 21 later stipulated to transferring the matter to

3  this court.  The court consolidated all three actions in orders

4  issued on April 6, 2011, and October 11, 2011.  (See No. Docket

5  Nos. 49, 62.)

6       On November 1, 2010, Century 21 filed a motion for a

7  preliminary injunction requesting that the court enforce All

8  Professional's post-termination obligations under the franchise

9  agreements.  (Docket No. 8.)  Prior to issuing a ruling on the

10 preliminary injunction motion, the court held an evidentiary

11 hearing in which it heard testimony from the parties on January

12 11, 2011.  On January 24, 2011, the court granted Century 21's

13 motion for preliminary injunction and enjoined All Professional

14 from further unauthorized use of Century 21's marks.  (Docket No.

15 28.)

16      Presently before the court is Century 21's motion for

17 summary judgment on its trademark infringement/unfair

18 competition, breach of contract, and breach of guaranty claims,

19 as well as all of All Professional's claims.[13]

20 II.  Requests for Judicial Notice/Evidentiary Objections

21      Century 21 requests that the court take judicial notice

22 of a number of documents previously filed in this case as well as

23 the transcript from the court's January 11, 2011, evidentiary

24 hearing.  All Professional additionally requests that the court

25

26      [13]  Century 21 represents that if the present motion for
   summary adjudication is granted in its entirety, it will dismiss
27 its remaining claims against All Professional.  (Mem. of P. & A.
   in Supp. of Pl.'s Mot. for Summ. Adjudication at 1 n.1 (Docket
28 No. 88-2).)  This would effectively render the present motion for
   partial summary adjudication a motion for summary judgment.

take judicial notice of a filed stipulation and agreement in the California Department of Real Estate matter In re: Idalia Lizzette Lombera & Franki Halloran, No. H-5325 SAC, and its notice of appeal from the court's order granting Century 21's preliminary injunction motion.  Because this is a motion for summary judgment, the court may consider these documents without taking judicial notice of them.

On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  "[T]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."  Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (quoting Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001)) (internal quotation marks omitted).  Even if the non-moving party's evidence is presented in a form that is currently inadmissible, such evidence may be evaluated on a motion for summary judgment so long as the moving party's objections could be cured at trial.  See Burch v. Regents of the Univ. of Cal., 433 F. Supp. 2d 1110, 1119-20 (E.D. Cal. 2006).

All Professional raises eight objections to portions of two declarations submitted by Century 21 on the grounds of lack of personal knowledge, improper opinion testimony, lack of foundation, improper legal conclusions, and inadmissible hearsay. Century 21 raises eleven objections to portions of Steve Wright's Declaration, (Docket No. 112-3), and twenty objections to

23

1 portions of All Professional's Statement of Additional Material

2 Facts, (Docket No. 112-2), on the grounds of lack of foundation,

3 relevance, speculation, lack of personal knowledge, inadmissible

4 hearsay, and that the statements are conclusory.

5        Objections to evidence on the ground that the evidence

6 is irrelevant, speculative, argumentative, vague and ambiguous,

7 or constitutes an improper legal conclusion are all duplicative

8 of the summary judgment standard itself.  See Burch, 433 F. Supp.

9 2d at 1119-20.  A court can award summary judgment only when

10 there is no genuine dispute of material fact.  It cannot rely on

11 irrelevant facts, and thus relevance objections are redundant.

12 Instead of objecting, parties should argue that certain facts are

13 not material.  Similarly, statements based on speculation,

14 improper legal conclusions, personal knowledge, or argumentative

15 statements are not facts and can only be considered as arguments,

16 not as facts, on a motion for summary judgment.  Instead of

17 challenging the admissibility of this evidence, lawyers should

18 challenge its sufficiency.  Objections on any of these grounds

19 are superfluous, and the court will overrule them.

20        In the interest of brevity, as the parties are aware of

21 the substance of their objections and the grounds asserted in

22 support of each objection, the court will not review the

23 substance or grounds of the individual objections here.  The

24 parties' objections are all overruled.

25 III. Choice of Law

26        As an initial matter, the parties dispute whether New

27 Jersey or California law applies to this dispute.  The contracts

28 at issue each contain a choice of law provision stating:  "This

24

Agreement will be governed by the laws of the state of New Jersey, except that the New Jersey Franchises Practice Act shall not apply to agreements with the Offices located outside of New Jersey." (Bertet Decl. ¶ 17, Exs. A-D § 22.7, at 35.)  All Professional argues that the court should hold that the choice of law provision is unenforceable and instead apply California law in this case.

Both parties agree that California choice of law analysis should govern the enforcement of the choice of law provision.  Under California law, the enforceability of choice of law provisions is governed by the Restatement of Conflicts of Laws and the California Supreme Court's decision in Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459 (1992).  It's Just Lunch Int'l v. Polar Bear, Inc., No. Civ. 03-2485, 2004 WL 3406117, at *2 (S.D. Cal. Apr. 29, 2004).  "In determining the enforceability of arm's-length, contractual choice-of-law provisions, California courts shall apply the principles set forth in Restatement section 187, which reflects a strong policy favoring enforcement of such provisions."  Nedlloyd, 3 Cal. 4th at 464-65.

Under Nedlloyd, California will apply the law indicated by the choice of law provision where: "(1) the chosen state has a substantial relationship to the parties or their transaction," or where "(2) there is any other reasonable basis for the parties' choice of law."  Id. at 466.  "If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law."  Id.  Where either test is met, the court proceeds to the second step and "determine[s] whether the

25

chosen state's law is contrary to the fundamental policy of California." Id. If there is no conflict of this nature, the choice of law provision must be enforced. Id.

Where "there is a fundamental conflict with California law," the court proceeds to the third step and "determine[s] whether California has a materially greater interest than the chosen state in the determination of the particular issue. If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy." Id. (internal citations and quotations marks omitted).

A.   Substantial Relationship

Applying the Nedlloyd test here, the court must first determine "whether the chosen state has a substantial relationship to the parties or their transaction . . . ." Id. This requirement is satisfied because Century 21 has a substantial relationship with New Jersey because it is a limited liability company with its principal place of business and headquarters in New Jersey. See Nedlloyd, 3 Cal. 4th at 467 (citing Restatement of Conflicts of Laws § 187 cmt. f); It's Just Lunch Int'l LLC v. Island Park Enter. Grp., Inc., No. EDCV 08-367-VAP, 2008 WL 4683637, at *2 (C.D. Cal. Oct. 21, 2008).

Moreover, Century 21's New Jersey residence provides a "reasonable basis" for a contractual provision requiring application of New Jersey Law. "If one of the parties resides in the chosen state, the parties have a reasonable basis for their choice." Consul Ltd. v. Solide Enters., Inc., 802 F.2d 1143,

26

1  1147 (9th Cir. 1986).

2      B.   <u>Fundamental Policy</u>

3          The court next considers whether application of New

4  Jersey law would be contrary to "a fundamental policy" of

5  California.  There is no bright-line definition of a "fundamental

6  policy."  Restatement of Conflict of Laws § 187 cmt. g.  A

7  fundamental policy must be "substantive," and "may be embodied in

8  a statute which makes one or more kinds of contracts illegal or

9  which is designed to protect a person against the oppressive use

10  of superior bargaining power."  <u>Id.</u>

11          Here, All Professional's eighth cause of action is

12  based on the CFRA, which "serves to protect California

13  franchisees, typically small business owners and entrepreneurs,

14  from abuses by franchisors in connection with the nonrenewal and

15  termination of franchises."  <u>1-800-Got Junk? LLC v. Superior</u>

16  <u>Court</u>, 189 Cal. App. 4th 500, 516 (2d Dist. 2010).  Courts are

17  required to construe "the CFRA broadly to carry out legislative

18  intent, that intent . . . is to protect franchise investors, i.e.

19  those who 'pay for the right to enter into a business.'"  <u>Thueson</u>

20  <u>v. U-Haul Int'l, Inc.</u>, 144 Cal. App. 4th 664, 673 (1st Dist.

21  2006).  The CFRA's provisions "apply to any franchise where

22  either the franchisee is domiciled in this state or the

23  franchised business is or has been operated in this state."  Cal.

24  Bus. & Prof. Code § 20015.

25          The legislature was so concerned that the CFRA

26  statutory protections be provided to all franchisees that it

27  created an antiwaiver provision, which states that "[a]ny

28  condition, stipulation or provision purporting to bind any person

27

1    to waive compliance with any provision of this law is contrary to

2    public policy and void."  Cal. Bus. & Prof. Code § 20010.

3    Section 20010 though "only voids a choice of law provision which

4    requires a franchisee to 'waive compliance' with the protections

5    of the CFRA."  1-800-Got Junk?, 189 Cal. App. 4th at 518.  The

6    critical inquiry is therefore whether the enforcement of the New

7    Jersey choice of law provision would diminish the rights that All

8    Professional would otherwise have under the CFRA.

9              In this case, All Professional brings a claim under the

10   CFRA provision that prohibits termination of a franchise without

11   good cause and requires that the franchisee be given a reasonable

12   opportunity to cure.  See Cal. Bus. & Prof. Code § 20020.  It is

13   true that there is similar New Jersey statute, but it would not

14   provide such protections in this case because the New Jersey

15   Franchise Act does not cover franchisees that do not maintain a

16   franchise location in New Jersey.  See N.J. Stat. 56:10-4.

17   Application of New Jersey law, however, would not effectuate a

18   waiver of All Professional's protections under the CFRA because

19   the CFRA provision's good cause and opportunity to cure

20   requirements are incorporated into All Professional's franchise

21   agreements with Century 21.  (See Bertet Decl. Exs. A-D

22   § 16.2.4.)  Application of the CFRA would thus provide no greater

23   protection of All Professional than the franchise agreements

24   themselves.  Application of New Jersey law would therefore not

25   diminish All Professional's rights because any claims that All

26   Professional may have under the CFRA can be pursued as breach of

27

28

                                    28

1   contract claims under the franchise agreements.[14]   Accordingly,

2   the choice of law provision is enforceable and the court will

3   apply the laws of New Jersey.[15]

4   IV.  Discussion

5        Summary judgment is proper "if the movant shows that

6   there is no genuine dispute as to any material fact and the

7   movant is entitled to judgment as a matter of law."  Fed. R. Civ.

8   P. 56(a).[16]  A material fact is one that could affect the outcome

9   of the suit, and a genuine issue is one that could permit a

10  reasonable jury to enter a verdict in the non-moving party's

11  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

12  (1986).  The party moving for summary judgment bears the initial

13

14  [14]   All Professional additionally claims, without providing
    any analysis or authority, that the limited waivers in the 2006
15  addenda violate the antiwaiver provision in the CFRA.  These
    limited waivers do not serve to reduce any of All Professional's
16  rights under the CFRA, however, because the CFRA provisions
    remain incorporated in the franchise agreements so breach of
17  contract claims may still be brought.  Furthermore, the only
    claims that All Professional raises under the CFRA, namely
18  regarding the termination of the franchises, occurred after All
    Professional signed the limited waivers.

19  [15]   All Professional does not suggest that application of
20  New Jersey law would violation a fundamental California public
    policy for any claims other than its CFRA claim.  Absent
21  interference with a fundamental public policy, "[t]he mere fact
    that the chosen law provides greater or lesser protection than
22  California law would, are not reasons for applying California
    law."  Medimatch Inc. v. Lucent Techs. Inc., 120 F. Supp. 2d 842,
23  862 (N.D. Cal. 2000).  Application of New Jersey law will
    undermine All Professional's statutory claim under California's
24  UCL, however, courts have held that application of a choice-of-
    law provision that bars a UCL claim does not violate a
25  fundamental California public policy.  See, e.g., Abat v. Chase
    Bank USA, N.A., 738 F. Supp. 2d 1093, 1096 (C.D. Cal. 2010); It's
26  Just Lunch, 2008 WL 4683637, at *4.

27  [16]   Federal Rule of Civil Procedure 56 was revised and
    rearranged effective December 1, 2010.  However, as stated in the
28  Advisory Committee Notes to the 2010 Amendments to Rule 56,
    "[t]he standard for granting summary judgment remains unchanged."

burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. Id. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Id.

A.   Century 21's Claims

1.   Breach of Contract

30

To state a claim for breach of contract under New Jersey law, there must be proof of "(1) a contract between the parties, (2) a breach of that contract, (3) damages flowing therefrom; and (4) that [the plaintiff] performed its own contractual obligations." Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007).  Century 21 brings its claim for breach of contract on the basis that All Professional and All Professional Hawaii defaulted under the terms of the franchise agreements by failing to pay their franchise fees.  All Professional does not dispute that it failed to pay franchise fees pursuant to the franchise agreements, but argues that it was excused from fully performing in the face of Century 21's breaches of the agreements.  The court will address the terms of the franchise agreements and then will consider each of Century 21's alleged breaches in turn.

a.   Interpreting the Franchise Agreement

"The primary standard governing the interpretation of an integrated agreement is to use 'the meaning that would be ascribed to it by a reasonably intelligent person who was acquainted with all the operative usages and circumstances surrounding the making of the writing.'" YA Global Invs., L.P. v. Cliff, 419 N.J. Super. 1, 11 (App. Div. 2011) (quoting Deerhurst Estates v. Meadow Homes, Inc., 64 N.J. Super. 134, 149 (App. Div. 1960)).  On a motion for summary judgment, a court may properly interpret a contract as a matter of law only if the meaning of the contract is unambiguous.  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 990 (9th Cir. 2006) (citation omitted).

31

Under New Jersey law, "[e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement.  This is so even when the contract on its face is free from ambiguity."  Halper v. Halper, 164 F.3d 830, 840 (3d Cir. 1999) (quoting Alt. N. Airlines v. Schwimmer, 12 N.J. 293, 301 (1953)).  Although extrinsic evidence is permitted to determine the meaning of contractual terms, after the meaning of the contract is discerned the parol evidence rule "prohibit[s] the introduction of extrinsic evidence to vary the terms of the contract."  Conway v. 287 Corporate Ctr. Assocs., 187 N.J. 259, 270 (2006).  Summary judgment is inappropriate if the court cannot determine the parties' intent at the time of contracting without judging the credibility of the extrinsic evidence.  See City of Hope Nat. Med. Ctr. v. Genentech, Inc., 43 Cal. 4th 375, 395 (2008).

In this case, All Professional does not dispute that the franchise agreements are integrated agreements.  (See Bertet Decl. Exs. A-D § 22.15.)  The only provision of the agreements that All Professional suggests is ambiguous is section 4.1, which states, in pertinent part:

> **License, Policy and Procedure Manual**.  As of the Effective Date, we grant you a nonexclusive license (I) to use the Marks for the Business at and from the Office and to hold the Business out to be a participant in the System, and (ii) to use the System for the operation of the Business at and from the Office.  You accept the nonexclusive license granted by us, subject to the terms and conditions of this Agreement and the P&P Manual as amended from time to time. . . . The P&P Manual contains our recommended methods, specifications and procedures relating to the use and protection of the System.

(Id. Exs. A-D § 4.1.)  The agreements define "System" to mean the business format and methods developed or licensed by

32

us for the promotion and assistance of independently owned and operated real estate brokerage offices, including policies, procedures, and techniques designed to enable such offices to compete more effectively in the real estate sales market.  The System includes common use and promotion of certain Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs.  We may update the System at any time and expect to continue to do so as we deem advisable in our sole judgment and discretion.

(Id. Exs. A-D § 3.1.14.)

All Professional contends that Century 21's use of the term "System" is ambiguous and argues that "[a] reasonable interpretation of the Century 21 drafted Agreement is that the 'System' includes a promise to prevent intra family recruiting, preserve the financial privacy of a franchisee and to protect the Century 21 service mark."  (Opp'n to Summ. Adjudication at 27:27-28:1 (Docket No. 93).)  All Professional does not explain why application of the definition provided in the agreements for the term "System" would produce an ambiguous result, nor why its proposed interpretation is reasonable.

The plain and clear language of section 4.1 grants the franchisee a non-exclusive license to use Century 21's marks and system.  The definition of "system" provided in the agreements, which encompasses use of Century 21's marks, copyrights, trade secrets, and advertising programs, is consistent with the plain purpose of section 4.1.  All Professional's proposed definition of "System," which would obligate Century 21 to prevent intra family recruiting, preserve financial privacy, and protect Century 21's service mark, is inconsistent with the plain meaning of section 4.1 in defining the scope of the non-exclusive license because it places affirmative obligations upon Century 21, rather

33

than defining All Professional's rights under the non-exclusive license.

All Professional's proposed definition of "System" also contradicts other provisions in the franchise agreements. Section 4.4.1 provides that "You shall be responsible for, and supervise all of your Affiliates in order to assure, the proper use of the Marks and the System in compliance with this Agreement." (Bertet Decl. Exs. A-D § 4.4.1.)  Section 21.2 further provides that Century 21 has "no right to regulate or participate in the recruitment, selection, engagement, retention, discipline, or termination of your sales associates or employees." (Id. Exs. A-D § 21.2.)  These terms place the obligation to enforce compliance with Century 21's proposed recruiting practices on All Professional and suggest that inserting an obligation into the term "System" for Century 21 to manage a franchisee's employment practices is inconsistent with other terms in the agreement.

Finally, nothing All Professional has submitted regarding the circumstances surrounding the franchise agreements supports their proposed definition or claims that the agreements are ambiguous.  Based on the evidence submitted, section 4.1 of the franchise agreements is not susceptible to more than one meaning and is therefore not ambiguous.  The court can thus interpret the contracts as a matter of law.

> b.  <u>All Professional's Allegations that Century 21 Breached the Contract and Excused All Professional's Performance Under the Franchise Agreements</u>

1    All Professional submits a number of ways in which it

2  alleges that Century 21 breached the franchise agreements in a

3  manner that excused its performance.[17]   The court will address

4  each alleged breach in turn.

### 1.   Improper Recruiting

6    The Century 21 Code of Conduct states that "[t]he

7  Franchisee and its Office Personnel should avoid recruiting

8  (which shall include, but shall not be limited to, personal

9  solicitations, mass mailings, personal mailings, and/or

10 advertising), other CENTURY 21 Franchisees' Sales Associates

11 unless the other CENTURY 21 Franchisee first consents to such

12 recruiting activities." (Compendium of Exhibits Ex. 15 ("Code of

13 Conduct") at 24 (Docket No. 103).)  All Professional argues that

14 Century 21 breached the franchise agreements when it failed to

15 stop other franchises from recruiting its agents.  As a result of

16 this breach, All Professional claims that its revenues dropped,

17 rendering it unable to, and therefore excused from, paying its

18 franchise fees.

19    With respect to Steve Wright's complaints to Century

20 21, Century 21 had no obligation under the agreements to prevent

21 other franchisees from recruiting All Professional's agents.  To

22 the contrary, Century 21 did not have the right to do so.  As

23

24    [17]   Of the eight ways that All Professional stated in its
   interrogatory responses that Century 21 breached the franchise
25 agreements, All Professional does not discuss three alleged
   breaches in its opposition.  (See Rudin Decl. ¶¶ 5-6, Exs. D-E.)
26 Specifically, All Professional does not address Century 21's
   alleged failure to: (1) utilize NAF fees to promote All
27 Professional, (2) provide relocation referrals, or (3) prevent
   All Professional Hawaii partner John Sherman from leaving All
28 Professional and joining a competing franchise.  The court
   accordingly does not address these claims.

discussed above, section 21.2 provided:

> [Century 21] will have no obligation to pay your
> commissions, taxes, wages or other expenses, and will
> have no right to regulate or participate in the
> recruitment, selection, engagement, retention, discipline
> or termination of your sales associates or employees,
> . . . except as may be necessary to protect the Marks and
> goodwill.

(Bertet Decl. Exs. A-D § 21.2.)  This provision applied to all of

Century 21's franchise agreements, and therefore also governed

its relationship with Select and All Islands.  The remedy, as

this court explained previously, was for All Professional to sue

Select, the Century 21 franchisee that allegedly recruited All

Professional's agents and moved into the same Folsom office that

All Professional vacated.[18]

Century 21 did not have the right to run either All

Professional's or Select's business.  It was at best in the

position of mediator, with no authority to enforce sanctions

against either party.  Regardless of Century 21's actions,

Select's alleged recruiting of All Professional's agents was no

excuse for All Professional to stop paying fees to Century 21.

---

[18]   All Professional suggests that under section 10.3 of
the franchise agreements, Century 21 had the discretion to
terminate franchises that engaged in unethical recruiting
behavior.  (See Bertet Decl. Exs. A-D § 10.3.)  As an initial
matter, it is unclear whether this provision applies to
recruiting violations based on Century 21's Code of Conduct,
which is discussed in section 10.2.  Section 10.3 discusses
compliance with the Code of Ethics of the National Association of
Realtors, local, state, and federal law.  A reasonable
interpretation of the termination provision is that Century 21's
discretion to terminate franchises is limited to transactions
violating these provisions, and not Century 21's internal code.
Even if Century 21 had the discretion to terminate franchises for
violations of recruiting practices, the provision does not
obligate Century 21 to take any action, rather it may do so "at
[its] option."  (Id.)  All Professional's reliance on this
provision therefore fails to demonstrate a material fact
suggesting breach of contract.

36

1                        2.   Divulging of Confidential Information

2              All Professional alleges that Century 21 released

3  confidential information regarding its finances that undermined

4  its agents' confidence in the franchise and encouraged other

5  franchises to recruit All Professional's agents.[19]   (See Steve

6  Wright Dep. II at 72:16-73:24.)   The only provision in the

7  franchise agreements that addresses Century 21's obligations

8  regarding All Professional's confidential information is section

9  13.5.   Section 13.5 provides that "no information supplied to us

10  shall be considered confidential by the parties."   (Bertet Decl.

11  Exs. A-D § 13.5.)

12             All Professional argues instead that the term "System"

13  in section 4.1 should be construed to place an obligation on

14  Century 21 to protect All Professional's information from

15  disclosure.   As the court discussed above, such an interpretation

16  is inconsistent with the plain meaning of section 4.1 and would

17  flatly contradict section 13.5.   Because Century 21 had no duty

18  to protect All Professional's confidential information under the

19  franchise agreements, any information allegedly divulged cannot

20  be used to establish a breach of contract or as an excuse for All

21  Professional to stop paying its franchise fees.

22                        3.   Failing to Protect the Century 21 Name

23

24        [19]   The only evidence supporting All Professional's claim
   that its confidential information was divulged by Century 21 is
25  hearsay testimony in the form of Steve Wright's uncorroborated
   deposition.   Steve Wright acknowledged that he never heard any
26  Century 21 agent reveal the information nor did he ever see the
   statements in writing, but stated that it must have been
27  Bainbridge who divulged the information.   (Rudin Decl. Ex. A
   ("Steve Wright Dep. III") at 254:23-259:17 (Docket No. 88-9).)
28  Bainbridge denied having shared All Professional's financial
   information.   (Bainbridge Dep. at 191:20-195:23.)

1    All Professional alleges that Century 21's failure to

2  protect its name and marks violated the franchise agreement and

3  that the resulting consumer confusion caused All Professional to

4  lose business.  All Professional fails to direct the court's

5  attention to any provision in the franchise agreements that

6  imposes an obligation on Century 21 to protect the Century 21

7  name from infringement by third parties.  Once again, All

8  Professional relies on its reinterpretation of the term "System"

9  in section 4.1 to impose such an obligation on Century 21.

10  Section 4.1 cannot be reasonably interpreted to impose an

11  affirmative obligation on Century 21 to initiate third-party

12  lawsuits based on All Professional's complaints.

13    Instead, section 4.4.2 provides that Century 21

14  "reserve[s] the right to approve any and all public uses of the

15  Marks . . . . At our sole option, we or an affiliate will obtain

16  and maintain its registrations for the Marks and exercise the

17  rights against infringement or unauthorized use of the Marks."

18  (Id. Exs. A-D § 4.4.2.)  The language of section 4.4.2 suggests

19  that Century 21 retains the discretion to decide when to take

20  action against infringers.  All Professional's interpretation of

21  section 4.1 contradicts the discretion that Century 21 is given

22  under section 4.4.2 and would therefore be an unreasonable

23  interpretation.  Because Century 21 has no affirmative duty to

24  prosecute entities that infringe upon its Mark, Century 21's

25  alleged inaction cannot be used to establish that it breached the

26  franchise agreements.

27            4.   Facilitating Select's Move to Folsom

28    Section 5.2 of the franchise agreements provides that

38

1  "during the term of this agreement, [Century 21] shall not grant

2  another franchised CENTURY 21 office at a location which is

3  within .25 mile . . . of [All Professional's] Office." (<u>Id.</u> Exs.

4  A-D § 5.2.)  All Professional argues that Century 21 breached the

5  franchise agreement when it allowed Select to move into the

6  Folsom office that All Professional had previously used.[20]  At

7  the time that Century 21 approved Select's application to move to

8  Folsom, All Professional's Folsom franchise had already been

9  terminated on the grounds of abandonment.  Therefore, Century 21

10 did not violate section 5.2 of the franchise agreement.  All

11 Professional points to no other provisions in the franchise

12 agreements that suggest that Century 21 was barred from

13 permitting Select's move to Folsom.

14              5.  <u>Failing to Provide the "Tools and</u>

15                  <u>Systems" Promised</u>

16        All Professional alleges that Century 21's failure to

17 provide "tools and systems" excused All Professional's

18 performance under the franchise agreements.  It is unclear to the

19 court what "tools and systems" All Professional is referring to,

20 but it appears that All Professional believes that the "tools and

21 systems" would increase its productivity.  Once again, All

22 Professional fails to cite the provision of the franchise

23 agreement it is relying on for this claim.

24        Section 23.9 of the franchise agreements states that

25 All Professional "acknowledge[s] that neither [Century 21], nor

26

27        [20]   The court addresses below whether Century 21's
28 termination of All Professional's Folsom franchise was proper
   under the franchise agreement.

                              39

any other person has guaranteed or warranted that you will
succeed in the operation of the Franchise . . . ."  Similarly,
section 23.10 of the franchise agreements states that All
Professional acknowledges that Century 21 "neither orally or in
writing represented any specified level of sales or profit."  As
discussed above, reading a obligation into section 4.1 that
Century 21 provide "tools and systems" to ensure profitability is
incompatible with the section's clear meaning and other
provisions of the agreement.

        Assuming that the franchise agreements did require
Century 21 to provide All Professional with "tools and systems,"
All Professional has failed to raise a genuine issue of material
fact showing that Century 21 failed to provide the required
"tools and systems."  Rather, All Professional's argument and
evidence relies on the circular reasoning that because it was not
profitable, Century 21 must have failed to provide it will
sufficient "tools and systems."  Such tautology is not enough to
defeat a motion for summary adjudication.  It is clear from the
evidence that All Professional was provided with various tools
and systems, such as the lead router, which All Professional
found important enough to move this court for a preliminary
injunction requiring Century 21 to allow it continued access to
the Century 21 system.

                6.   <u>Preventing All Professional from Curing</u>
                     <u>its Defaults</u>

        All Professional argues that Century 21 prevented it
from curing its defaults by not properly accounting for All
Professional's overdue fees, failing to provide it with a payment

40

plan, and then terminating the franchises without notice.

All Professional's Folsom franchise was terminated under the franchise agreement's abandonment clause, section 16.2.5.4, for failure to operate the office for more than five consecutive business days.  Abandonment is a non-curable default for which Century 21 can terminate a franchise without notice. (Bertet Decl. Exs. A-D § 16.2.5.)  It is unclear how Century 21 could have acted to prevent All Professional from curing its breach since it was within All Professional's sole control to reopen its Folsom office -- Century 21 did not own the premises or evict All Professional.  If anything, by waiting more than six months to terminate All Professional's Folsom franchise, Century 21 gave All Professional more time to cure its abandonment breach than it was required to under the franchise agreement.

The Sacramento and Hawaii franchises were terminated after All Professional failed to cure its defaults by the May 10, 2010, deadline set in the April 5, 2010, notice of default letters.  As the court discussed in its preliminary injunction order, All Professional's negotiations with Century 21 to create an alternative payment plan did not relieve All Professional of its obligation to pay its default in full by the cure date.[21] Century 21 was under no obligation to enter into such discussions or provide a payment plan.

---

[21]   The fact that the Wrights did not even attempt to contact Century 21 until May 6, 2010, four days before the cure date, to set up a payment plan and dispute the account totals is further evidence that All Professional's failure to act before the cure date is its own fault.  With the exception of the Wrights' initial discussions with Century 21 on May 6 and May 7, all of the discussions that All Professional relies upon occurred after the cure date.

1    Since the preliminary injunction hearing All
2 Professional has provided additional details regarding the terms
3 of its negotiation with Century 21.  None of this evidence though
4 suggests that All Professional ever reached a deal with Century
5 21 regarding a payment plan or that Century 21 made any
6 representations to All Professional that it should wait to pay
7 off any portion of its default until after an agreement was
8 reached.  The evidence does suggest that the majority of the
9 overdue franchise fees were undisputed and that All Professional
10 failed to pay even the undisputed fees.

11    It was unequivocally clear from the testimony of the
12 Wrights during the evidentiary hearing on the preliminary
13 injunction motion that the primary reason they did not pay the
14 franchise fees they owed to Century 21 was that they did not have
15 the money to do so.  It was not because All Professional did not
16 know the amount to pay nor was it because Century 21 had
17 defaulted on its obligations.

18    The Wrights now present evidence that suggests that
19 they did have adequate funds to pay the franchise fees that they
20 owed.  (Compendium of Exhibits Ex. 30.)  This new evidence
21 directly contradicts the Wrights' repeated sworn assertions
22 during the evidentiary hearing that they did not have the funds
23 available to pay off their default and their claim that the
24 Folsom office was closed due to cash flow problems.  Regardless
25 of this new evidence, All Professional provides no evidence
26 showing that Century 21 prevented it from paying off its accounts
27 directly with cash.  All Professional has failed to provide any
28 material facts suggesting that Century 21 prevented it from

42

curing its breach and excusing its obligation to perform under the franchise agreements.

### 7. Terminating Franchise Agreements in Bad Faith

Finally, All Professional argues that Century 21 terminated the franchise agreements in bad faith because the terminations for non-payment and abandonment were actually "pretext" for Century 21's ulterior motives. All Professional's argument appears to be premised on the assumption that if Century 21 terminated the contracts in bad faith, Century 21 was in breach of contract. It is not clear how this would function to otherwise excuse All Professional's performance under the franchise agreements. In support of its argument that termination of a franchise agreement pursuant to its express terms is invalid if there is some pretextual motive, All Professional cites section 20020 of the CFRA[22] and JRS Products, Inc. v. Matushita, Electric Corp. of America, 115 Cal. App. 4th 168, 173 (2004).

Section 20020 of the CFRA prohibits termination of a franchise without good cause and requires that the franchisee be given a reasonable opportunity to cure. See Cal. Bus. & Prof. Code § 20020. All Professional's argument appears to rely on the interpretation of "good cause" as including a "good faith," as

---

[22]    Application of New Jersey law in this case technically bars consideration of claims under the CFRA. However, the protections in section 20020 of the CFRA also appear in sections 16.2.3 and 16.2.4 of the franchise agreements. Interpretation of All Professional's argument based on the specific provisions in the franchise agreements would therefore produce the same analysis and conclusion.

opposed to "bad faith," requirement.  "Good cause" is defined in section 20020 of the CFRA to "include, but not be limited to, the failure of the franchise to comply with any lawful requirement of the franchise agreement after being given notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure the failure."  Id.  The CFRA makes no mention of a "good faith" requirement and All Professional fails to cite any caselaw suggesting such a requirement.  Under section 20020, Century 21's termination of All Professional's franchises was in good faith because Century 21 provided All Professional with more than 30 days to cure its default.  All Professional's reliance on JRS Products is similarly of no help as the decision does not discuss pretextual termination at all.

        "If a party has a legal right to terminate the contract . . . , its motive for exercising that right is irrelevant.  The party can seize on a ground for termination given it by the contract to terminate the contract for an unrelated reason."  Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 589 (7th Cir. 2000).  It is entirely possible that if All Professional's relationship with Century 21 had been better, Century 21 may have been inclined to work harder to maintain or restore All Professional's franchises.  Regardless of Century 21's motives leading up to the termination of All Professional's franchises, though, the terminations were properly conducted under the franchise agreements and therefore Century 21's motive is irrelevant.

        All Professional further claims that the termination of its Folsom franchise was "patently a pre-text" because the

44

termination violated the terms of the franchise agreement's

abandonment clause.  (Opp'n to Mot. for Summ. Adjudication at

29:13-14.)   Section 16.2.5 of the franchise agreements provides

that:

> Abandonment of your Office(s), demonstrated by removal of
> the Marks or by your not operating the Business for five
> consecutive business days or any shorter period when,
> under the facts and circumstances, it would not be
> unreasonable for use to conclude that you do not intend
> to continue to operate the Business.

(Bertet Decl. Exs. A-D § 16.2.5.)  All Professional argues that

it was not reasonable for Century 21 to conclude that they no

longer intended to operate the Folsom office and therefore they

did not abandon the franchise.

       All Professional interprets section 16.2.5 to require

proof that the franchisee does not intend to continue to operate

the business when the office has not been operational for five

business days or more.  A plain reading of section 16.2.5 only

requires a determination of whether the franchise intends to

continue operation of the business where the office has not been

operational for less than five days.  To interpret the section as

stating otherwise would render the provision's distinction

between a business that has not operated for five consecutive

business days and one that has not operated for a shorter period

meaningless because Century 21 would always be required to

undergo analysis of the "facts and circumstances."  All

Professional's interpretation thus fails to give meaning to the

entirety of the provision and is not reasonable.

       Century 21 properly terminated the Folsom franchise

after All Professional failed to conduct business out of the

45

office, or any other Folsom office, for over six months.  The
termination was therefore not "patently a pre-text."

The court further notes that even if the termination of
All Professional's Folsom franchise was improper under the
franchise agreement's abandonment clause, the termination would
have been proper had Century 21 relied on All Professional's
failure to cure its default on the Folsom franchise.  The April
5, 2010, notice of default on the Folsom franchise specified a
cure date of May 10, 2010.  (Bertet Decl. Ex. J.)  Century 21 did
not terminate All Professional's Folsom office on abandonment
grounds until May 24, 2010, (Compendium of Exhibits Ex. 31), well
after the cure date.

All Professional has failed to demonstrate that Century
21 was in breach of the franchise agreement in any manner.  All
Professional's performance under the agreements was therefore not
excused.  Accordingly, the court will grant Century 21's motion
for summary adjudication of its claim that All Profession was in
breach of contract with respect to the four franchise agreements.

### c.   Breach of the DAN Agreement

Century 21's breach of contract claim also includes
breach of the DAN agreement by All Professional for failure to
make required payments.  Under the DAN agreement, All
Professional received a $75,000 loan, repayment of which would be
waived in each year that All Professional reached a minimum
threshold in gross revenues.  All Professional did not reach the
minimum threshold in gross revenue for three separate years, yet
it never made any of the required payments under the DAN.  All
Professional does not dispute these facts, but instead argues

46

1  that its failure to make the required payments under the DAN

2  should be excused or were otherwise not required.

3         Under New Jersey law, a written contract is considered

4  integrated "when the parties intend it to constitute the complete

5  and final expression of their agreement.  When a contract lacks

6  an express integration clause the district court must determine

7  whether the parties intended their agreement to be an integrated

8  contract by reading the writing in light of the surrounding

9  circumstances."  Rite Aid of N.J., Inc. v. United Food &

10 Commercial Workers, Civ. No. 11-00374, 2011 WL 5920939, at *6

11 (D.N.J. Nov. 28, 2011) (quoting Starter Corp. v. Converse, Inc.,

12 170 F.3d 286, 295 (2d Cir. 1999)).

13        The parties dispute whether the DAN is an integrated

14 contract.  The agreement does provide that All Professional

15 "acknowledges and agrees that neither [Century 21] nor any of its

16 affiliates has made any representations or warranties, nor

17 furnished any information to them concerning any aspect of the

18 Franchise Agreements or [All Professional's] business."  (Bertet

19 Decl. Ex. E at CENT000294.)  This provision, however, is included

20 in a paragraph that begins by limiting its applicability to

21 situations where the "Note is being executed in connection with

22 the acquisition or consolidation (by merger, acquisition or

23 otherwise) of a real estate brokerage business."  (Id. Ex. E at

24 CENT000293-CENT000294.)  Although the specific sentence that

25 Century 21 relies upon does not specifically contain this

26 limitation, it appears at the end of a paragraph that repeatedly

27 limits its contents to DANs signed in connection with an

28 acquisition or consolidation.  The DAN agreement in this case was

47

1  not signed in connection with the acquisition or consolidation of

2  a franchise, therefore it would be reasonable to read the

3  limitation on the effect Century 21's representations as not

4  applying in this case.  The court will thus consider the

5  surrounding circumstances.[23]

6          All Professional points to statements made by Omer,

7  Century 21's Western Regional Vice President, at the time it

8  signed the DAN suggesting that the Wrights were "not to worry"

9  about repaying the DAN because of the new "tools and systems"

10 that Century 21 was developing.  All Professional argues that

11 after it signed the DAN, Century 21 began to provide less

12 support, never provided the "tools and systems" promised, and

13 began to allow other franchises to steal All Professional's

14 agents.  The court has already addressed these complaints --

15 Century 21 met its obligations under the franchise agreements and

16 did not guarantee that All Professional would be profitable.  As

17 Steve Wright himself conceded, Omer never "said that we would be

18 profitable.  They said we would be more productive and sell more

19 houses."  (Steve Wright Dep. I at 67:11-15.)

20         Aside from All Professional's evidence regarding Omer's

21 representations, the surrounding circumstances support the direct

22 application of the DAN provision that failure to meet gross

23 revenue thresholds would require DAN payments.  At the time that

24 All Professional and the Wrights signed the DAN agreement, they

25 also executed a Security Agreement and an Amendment to the River

26 _____

27     [23]  As the court noted above, even if the DAN were an
   integrated agreement, review of the surrounding circumstances
28 would be appropriate under New Jersey law.  See Halper, 164 F.3d
   at 840-41.

Park franchise agreement that contained provisions specifically pertaining to repayment of the DAN.  These agreements, which do contain integration clauses, and the plain language in the DAN agreement regarding the circumstances under which DAN payments would be required suggest that there would be circumstances under which a franchise would not meet its gross revenue threshold and would be required to repay a portion of the DAN.  All Professional's proposed interpretation of the DAN as placing an affirmative obligation on Century 21 to provide "tools and systems" so that All Professional would always meet the gross revenue threshold, or to waive the DAN payments, is inconsistent with this evidence.  Because Century 21 had no obligation to ensure that All Professional never had to repay the DAN, All Professional's failure to perform under the DAN agreement is not excused.

Accordingly, the court will grant Century 21's motion for summary adjudication for its claim that All Professional was in breach of contract with respect to the DAN agreement.

d.   Actual Damages

Consideration of damages is appropriate because the court has found that All Professional was in breach of contract of both the franchise agreements and the DAN and has granted Century 21's motion for summary adjudication.  The parties dispute the amount of damages that Century 21 is entitled to in compensation for All Professional's breach of the franchise agreements.  Century 21 claims that All Professional currently owes past due franchise and advertising fees totaling $196,954.90.  All Professional raises a number of objections to

49

the charges.  The court will address each objection in turn.

First, All Professional objects to Century 21's accounting for the River Park, Florin Road, and Hawaii franchises because it alleges that it was prevented from paying past due service fees after Century 21 terminated support services. (Steve Wright Decl. in Supp. of Defs.' Opp'n to Mot. for Summ. Adjudication ("Steve Wright Decl. II") ¶¶ 4, 6-7 (Docket No. 95).)[24]  The fact that All Professional no longer had access to Century 21's online payment system after its franchises were terminated neither excuses its failure to pay its past-due franchise fees nor constitutes a disputed material fact regarding the amount ultimately due.

All Professional next objects to any portion of the DAN being due on account of Century 21 "withholding services essential to maintain production."  (Id. ¶ 4.)  The court has already dismissed this objection above.

Third, All Professional disputes the accounting for NAF advertising fees for the River Park franchise.  Specifically, All

_____

[24]  Century 21 objects to the evidence presented by All Professional to dispute the amounts owed under the franchise agreements.  The only evidence submitted by All Professional is paragraphs four through seven of Steve Wright's July 16, 2012, declaration.  (Docket No. 95.)  In Steve Wright's June 11, 2012, deposition testimony he stated that other than All Professional's objection to the DAN charges, he did not know which accounting charges All Professional disputed but that Carol Wright might know about the specific charges All Professional contested. (Rudin Decl. in Supp. of Century 21's Reply Ex. C ("Steve Wright Dep. IV") at 38:1-39:12 (Docket No. 112-1).)  Although it is true that a party may not create an issue of fact by submitting an affidavit contradicting prior deposition testimony, see Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991), that does not appear to be the case here.  It is a perfectly reasonable inference to draw that after his deposition, Steve Wright talked to Carol Wright and learned of the specific additional accounting disputes.

1   Professional argues that it was overcharged by $1,359 in

2   advertising fees that were first charged in January 2007 and

3   previously waived by Century 21 as an erroneous charge.  (Id.)

4   The only evidence that All Professional presents in support of

5   this disputed charge is Steve Wright's conclusory deposition

6   statement that the charge had been waived.  (Id.)  Century 21's

7   alleged waiver of the charge appears to be connected to its 2008

8   proposal to waive All Professional's 2007 DAN and NAF fees in

9   exchange for All Professional signing a one-year extension on its

10  franchise fees.  (Rubin Decl. Ex. B ("Carol Wright Dep. II") at

11  159:16-161:8.)  Because All Professional did not agree to the

12  proposal, Century 21's offer to waive the NAF fees is not

13  binding.  Steve Wright's conclusory statement arguing otherwise

14  is not sufficient.[25]  All Professional has thus failed to present

15  evidence establishing a materially disputed fact regarding this

16  charge.

17         Fourth, All Professional disputes a $1,500 charge for a

18  lead router charged to the River Park franchise's account.

19  (Steve Wright Decl. II ¶ 4.)  According to Steve Wright, All

20  Professional never agreed to pay for the router.  (Id.)  During

21  oral arguments, Century 21 was unable to point to any evidence

22

23  _____

24      [25]    In All Professional's response to Century 21's
    statement of undisputed facts, it also states that in a June 16,
    2010, phone conversation the parties reached an agreement to
25  waive $304.50 in advertising fees.  (Defs.' Resp. to Statement of
    Undisputed Facts ¶ 63 (Docket No. 95).)  That agreement, however,
26  was part of the parties' negotiations that were never finalized.
    Moreover, the evidence submitted by All Professional to support
27  this claim does not discuss the advertising fees at all.  All
    Professional does not rely on this evidence to support its
28  dispute on the $1,359 charge and given the deficiencies in the
    evidence the court will not do so either.

disputing this claim.  Without knowing the circumstances under
which the lead router was provided to All Professional, the court
is unable to determine whether the charge is proper.  All
Professional has thus presented evidence sufficient to establish
a materially disputed fact regarding this charge.

Fifth, All Professional disputes the minimum royalty
fees and advertising fees assessed after August 31, 2009, when it
closed its Folsom office.  (Id.)  All Professional cites to no
provision of the franchise agreement that permits a franchise to
unilaterally close its franchise office and not pay the minimum
royalty fees, while still technically retaining its status as a
Century 21 franchise.  Under the contract, therefore, All
Professional was required to pay the minimum royalty fees until
the franchise agreement was terminated.  The court also notes
that All Professional's argument discussed above that Century 21
was not entitled to terminate the Folsom franchise because All
Professional still intended to reopen the office directly
contradicts its claim that it should not be responsible for any
fees during that period.  All Professional thus fails to provide
a materially disputed fact suggesting that it was not responsible
for the minimum royalty fees assessed on the Folsom franchise
after August 31, 2009.

Finally, All Professional objects to Century 21's
accounting for the Florin Road and Hawaii franchises on the
grounds that it "disputes the accuracy of the fees claimed by
Century 21."  (Id. ¶¶ 6, 7.)  This conclusory statement is
insufficient to create a genuine issue of material fact as to the
amounts owed under either franchise agreement.  See Anheuser-

1 Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th
2 Cir. 1995) (noting that "conclusory or speculative testimony is
3 insufficient to raise a genuine issue of fact to defeat summary
4 judgment").

5       Accordingly, with respect to the damages that All
6 Professional owes Century 21 for breach of the franchise
7 agreements, the court finds that there is no genuine dispute as
8 to $195,454.90 of the $196,954.90 Century 21 claims.  There is,
9 however, a genuine dispute as to the remaining $1,500.00 claimed
10 by Century 21.

11             e.   Future Lost Profits

12       Section 16.7.2 of the franchise agreements provides
13 that in the event of early termination of the agreements, All
14 Professional shall immediately become obligated to pay Century 21
15 "lost future profits" that "shall be equal to the combined
16 monthly average of Royalty Fees, NAP contributions, and any other
17 fees under this Agreement . . . payable from the Effective Date
18 of this Agreement through the date of early termination,
19 multiplied by the number of months (or partial months) remaining
20 in the term of this Agreement" discounted to present value at a
21 rate of eight percent.  (Bertet Decl. Exs. A-D § 16.7.2.)  As a
22 result of the early termination of All Professional's franchises,
23 Century 21 claims that All Professional owes it lost future
24 profits in the amount of $250,029.34 on the River Park franchise,
25 $88,757.77 on the Folsom franchise, $155,671.48 on the Florin
26 Road franchise, and $80,541.98 on the Hawaii franchise.  (Id.
27 ¶¶ 42-45, Exs. R-U.)

28             "Generally, a liquidated damage clause is enforceable

53

in New Jersey where actual damages which would be sustained upon
a breach are difficult to project and are not readily susceptible
of proof under the rules of evidence.  The agreed upon sum must
not, however, be disproportionate to the presumable loss." Cent.
Steel Drum Co. v. Gold Cooperage, Inc., 491 A.2d 49, 54 (N.J.
App. Div. 1985), overruled on other grounds by Kutzin v. Pirnie,
591 A.2d 932 (N.J. 1991).  The party challenging a liquidated
damages clause bears the burden of proving its unreasonableness.
See id.  "Thus, the party challenging a stipulated damages clause
'must establish that its application amounts to a penalty.'"
Wasserman's Inc. v. Twp. of Middletown, 137 N.J. 238, 253 (1994)
(quoting Haromy v. Sawyer, 98 Nev. 544, 654 (1982)).

        The purpose of a stipulated damages clause is to
compensate the promisee for non-performance, and not to compel
the promisor to perform.  Id.  Accordingly, provisions for
liquidated damages are enforceable only if "the amount so fixed
is a reasonable forecast of just compensation for the harm that
is caused by the breach." Westmount Country Club v. Kameny, 82
N.J. Super. 200, 206 (App. Div. 1964).  A liquidated damages
clause is therefore unreasonable if "it does more than compensate
plaintiffs for their approximate actual damages caused by the
breach." Wasserman's Inc., 137 N.J. at 254.  When considered at
the time of contracting, the liquidated damages calculation in
the franchise agreements, basing Century 21's expected lost
profits on an average of All Professional's monthly revenue
appears reasonable.

        The New Jersey Supreme Court has suggested that
consideration of the reasonableness of a liquidated damages

clause at the time of breach, or actual damages, is also
appropriate in determining the reasonableness of the parties'
prediction of damages.[26]   Id. at 252.  "It is to be observed that
hindsight is frequently better than foresight, and that, in
passing judgment upon the honesty and genuineness of the
pre-estimate made by the parties, the court cannot help but be
influenced by its knowledge of subsequent events."  Id. (quoting
Corbin on Contracts § 1063 (1951)).  The court will therefore
consider the circumstances at the time of termination to
determine whether the liquidated damages clause is enforceable in
this case.

Here, All Professional presents evidence that it argues
suggests that at the time Century 21 terminated All
Professional's three franchises in Sacramento in Hawaii, it did
not expect that it would suffer any significant loss of profits.
In an email sent July 12, 2010, Bainbridge, a Century 21 business
consultant, told Popp, "I believe if we terminate we would get
most of the producing agents who are loyal to C21 . . . ."
(Compendium of Exhibits Ex. 34.)  After the terminations, in a
second email sent August 3, 2010, Bainbridge told Popp,
"Fortunately, we will more than replace [All Professional's]
production in this area with the Select ERA conversion this month

_____

[26]     In this respect, consideration of liquidated damages
claims under New Jersey law differs from California law, which
requires the party seeking to invalidate a liquidated damages
clause to show that the provision is "unreasonable under the
circumstances existing at the time the contract was made."  Cal.
Civ. Code § 1671(b).

. . . .″[27]  (Id. Ex. 36.)  While these emails suggest that at least Bainbridge did not believe that Century 21 would suffer major losses after terminating All Professional, it falls far short of establishing that the liquidated damages clause would be disproportionate with Century 21's actual losses.  All Professional continues to operate offices at all three locations which would otherwise have resulted in franchise and advertising fees for Century 21.  All Professional presents no evidence concerning it or Century 21's past or current revenues in these locations.  As the party with the burden of proof on this issue, the two emails presented by All Professional is insufficient to establish that Century 21 suffered no actual damages or that the liquidated damages clause would be disproportionate with Century 21's losses.

The court is more sympathetic to All Professional's arguments concerning the unfairness of applying the liquidated damages clause to the Folsom franchise because All Professional no longer operates an office at that location.  The court nevertheless may not substitute its own intuition for the lack of evidence presented by All Professional in this case, but must instead look to the evidence presented by the parties.  As All Professional pointed out in oral arguments, the emails from Bainbridge were sent after the Folsom franchise was terminated and therefore were not in reference to Century 21's profits in

---

[27]    Read in context, this second email only suggests that a new franchise was moving into the area and that because of this Century 21's net commissions would remain the same, not that Century 21 suffered no lost profits as a result of All Professional's termination.

1  Folsom.  All Professional presents no evidence regarding Century

2  21's losses in connection with the Folsom location.

3           Citing California law, All Professional further argues

4  that application of the liquidated damages clause would be

5  inappropriate in this case because Century 21 was the party that

6  chose to terminate the franchise agreement.  (Opp'n to Mot. for

7  Summ. Adjudication at 42:7-10 (citing Postal Instant Press, Inc.

8  v. Sealy, 43 Cal. App. 4th 1704, 1711 (2d Dist. 1996).)  The

9  California appellate court in Sealy found that where termination

10  of the franchise agreement was for failure to pay franchise fees,

11  the breach did not proximately cause the lost future profits and

12  therefore the liquidated damages provision was unenforceable.[28]

13  Sealy, 43 Cal. App. 4th at 1713.  Sealy's proximate cause

14  analysis has since been persuasively challenged in Radisson

15  Hotels Int'l, Inc. v. Majestic Towers, Inc., 488 F. Supp. 2d 953,

16  963 n.10 (C.D. Cal. 2007).  Absent compelling New Jersey

17  authority on the matter, the court will apply New Jersey's

18  presumption in favor of liquidated damages clauses.  See Cent.

19  Steel Drum, 491 A.2d at 54.[29]

20           Because there is not sufficient evidence showing that

21

22           [28]  Sealy is not applicable to the liquidated damages

23  clause for the Folsom franchise because that franchise agreement

    was terminated based on abandonment, not merely for failure to

24  pay franchise fees.

25           [29]  Even if the Sealy holding were applicable under New

    Jersey law, Sealy is distinguishable from the facts of the

26  current case because the franchisor in Sealy only

    vaguely stated that the franchisor would be entitled to the

27  "benefit of the bargain."  In this case, the franchise agreements

    expressly make All Professional liable for lost future profits

28  when early termination is "for cause," which includes failure to

    pay franchise fees.  See Radisson, 488 F. Supp. 2d at 962.

the liquidated damages provision will compensate Century 21 far in excess of its actual damages, the court finds that the provision is enforceable.  Accordingly, the court will grant Century 21's motion for summary damages as it relates to its liquidated damages request in the amount of $575,001.57.

### 2.   Breach of Guaranty

"The liability of a guarantor is measured by that of the principal, unless the agreement explicitly provides otherwise."  Nat'l Westminster Bank N.J. v. Lomker, 277 N.J. Super. 491, 498 (App. Div. 1994).  The Wrights signed guarantees on all four franchise agreements that cover all of All Professional and All Professional Hawaii's obligations under the franchise agreements.  (See Bertet Decl. Exs. A-D at 43-44.) Because the court found that All Professional breached the franchise agreements and because no payments have been made by the Wrights, it follows that the Wrights are also in breach of the guarantees.  Accordingly, the court will grant Century 21's motion for summary adjudication with respect to its breach of guaranty claim.

### 3.   Trademark Infringement and Unfair Competition

A federal claim for trademark infringement pursuant to section 32 of the Lanham Act requires (1) ownership of a registered trademark; (2) use of that mark beginning before the alleged infringer's use; (3) the alleged infringer's use without the alleged owner's consent; and (4) that the alleged infringer's use is likely to cause confusion, or to cause mistake, or to deceive.  See 15 U.S.C. § 1114(a); Century 21 Real Estate v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1998); Intel Corp. v.

58

Americas News Intel Pub., LLC, No. C 09-05085, 2010 WL 2740063,
at *2 (N.D. Cal. July 12, 2010).  The elements of a federal
unfair competition claim for false designation of origin of
services under section 43(a) of the Lanham Act is identical to
the federal trademark infringement claim, with the exception that
the trademark need not be registered.  See 15 U.S.C. § 1125(a);
Intel Corp., 2010 WL 2740063, at *2.  The only elements the
parties dispute are whether the agreements were properly
terminated and whether Century 21 has met its burden to show
likelihood of confusion.

     The merits of Century 21's claims depend in part on
whether Century 21 properly terminated the franchise
agreements.[30]  See McDonald's Corp. v. Robertson, 147 F.3d 1301,
1308 (11th Cir. 1998) ("[W]e find that the Lanham Act's
requirement that a franchisor demonstrate that unauthorized
trademark use occurred to prevail on the merits of a trademark
infringement claim against a franchisee necessitates some type of
showing that the franchisor properly terminated the contract
purporting to authorize the trademarks' use, thus resulting in
the unauthorized use of trademarks by the former franchisee."); S
& R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 375 (3d Cir.
1992) ("Once a franchise is terminated, the franchisor has the
right to enjoin unauthorized use of its trademark under the
Lanham Act.  Thus, Jiffy Lube will merit preliminary injunctive

---

     [30]   Because All Professional was no longer operating the
Folsom office, and therefore did not continue to use Century 21's
trademarks at that office, the court does not consider whether
Century 21 properly terminated All Professional's Folsom
franchise under this claim.

relief if it can adduce sufficient facts indicating that its
termination of Durst's franchises was proper."); see also Re/Max
N. Cent., Inc. v. Cook, 272 F.3d 424, 430 (7th Cir. 2001).
Termination of a franchise agreement may be improper under either
the terms of the agreement or state franchise laws.  See Re/Max
N. Cent., 272 F.3d at 430.

a.   <u>Use of Trademark Without Consent</u>

As the court previously found, the evidence establishes
that Century 21 properly terminated All Professional's franchises
under the terms of the franchise agreements.  Century 21 notified
All Professional of its intent to terminate the franchise
agreements and the opportunity to cure in April 5, 2010, letters,
following prior informal notices of failure to pay amounts due
that All Professional had ignored.  Having not received payment
of even the undisputed fees, Century 21 terminated the Sacramento
office agreements effective July 9, 2010.  Century 21 thus
properly waited more than 30 days after the notices of default
were sent as required under section 16.2.4 before it terminated
the agreements for All Professional's failure to cure.

b.   Likelihood of Confusion

The court previously found that All Professional's
continued use of the Century 21 marks was sufficient to establish
a likelihood of confusion.  (<u>See</u> Jan. 24, 2011, Order at 22:21-
24:27 (Docket No. 28).)  All Professional now argues that Century
21 has failed to show "actual confusion" by an appreciable number
of people and that its holdover infringement was not "willful"
because it desired to remain a Century 21 franchise and
subsequently de-marked after the court's preliminary injunction

60

1   order.

2          Evidence of actual confusion is not required to prevail

3   on a motion for summary judgment of a trademark infringement

4   claim.  See J.L. Williams Co. v. Le Conte Cosmetics, 523 F.2d

5   187, 191 n.5-6 (9th Cir. 1975) ("Although the trial court found

6   no evidence of actual confusion, this fact does not preclude this

7   Court from concluding that there is a 'likelihood of confusion',

8   as actual confusion is merely one factor to be considered by the

9   Court when it makes its determination.").  All Professional's

10  reliance on the decisions in Entrepreneur Media Inc. v. Smith,

11  279 F.3d 1135 (9th Cir. 2002), and KP Permanent Make-Up, Inc. v.

12  Lasting Impression I, Inc., 543 U.S. 111 (2004), to establish

13  that Century 21 has the burden to present proof of actual

14  confusion is misplaced.  These decisions only establish that

15  Century 21 bears the burden of proving likelihood of confusion

16  for an appreciable number of people, not actual confusion.  See

17  KP Permanent Make-Up, 543 U.S. at 121-22; Entrepreneur Media, 279

18  F.3d at 1151.  As the court described in detail in its

19  preliminary injunction order, Century 21 has met this burden.

20  (Jan. 24, 2011, Order at 22:21-24:27.)  All Professional has

21  presented no new facts suggesting that the court's prior order

22  was mistaken.

23          All Professional's underlying intent when it used the

24  Century 21 marks without authorization is irrelevant to the

25  question of willfulness.  It is undisputed that All Professional

26  was informed upon termination that it needed to de-identify.  The

27  fact that "All Professional desired to avoid disrupting their

28  relationships with their clients and their agents while this

61

dispute was litigated," (Opp'n to Mot. for Summ. Adjudication at
45:2-3), does not excuse its violation of Century 21's trademark.
There is no recognized exception to the Lanham Act that allows
infringers to continue using a mark during a legal dispute.  All
Professional has thus failed to provide material facts suggesting
that its infringement was not willful.  All Professional's remedy
if it believed that its franchises were wrongfully terminated was
to sue for damages and seek a preliminary injunction, not to
continue to use Century 21's marks without paying franchise fees.

All Professional's infringement of Century 21's marks
began in July 2010, when it failed to de-identify after its
franchises were terminated.  All Professional's argument that it
is not liable for trademark infringement because it de-marked
after the court issued its preliminary injunction order in
January 2011, lacks legal support.  All Professional was no
longer authorized to use Century 21's trademarks after its
franchises were terminated, and the fact that the court did not
issue a preliminary injunction for several months after the
termination did not give All Professional the right to use
Century 21's marks without Century 21's authorization.  All
Professional has thus failed to present material facts suggesting
that it did not violate Century 21's trademark.

In conjunction with its trademark claims, Century 21
also requests injunctive relief.  The Lanham Act gives courts the
"power to grant injunctions, according to the principles of
equity and upon such terms as the court may deem reasonable, to
prevent the violation" of a registrant's rights.  15 U.S.C.
§ 1116(a).  Injunctions are especially appropriate where the

62

infringing use is for a similar service.  See Century 21 Real

Estate Corp. v. Sandlin, 846 F.2d 1175, 1181 (9th Cir. 1988).

The standard for a permanent injunction is essentially the same

as for a preliminary injunction, with the exception that the

plaintiff must show actual success, rather than a likelihood of

success.  See Amoco Prod. Co. v. Village of Gambell, 480 U.S.

531, 546 n.12 (1987).  Since Century 21 has succeeded on its

trademark infringement claim, it is entitled to a permanent

injunction.  Accordingly the court will grant Century 21's motion

for summary adjudication of its trademark infringement and unfair

competition claims and will permanently enjoin All Professional

from further use of Century 21's marks.

### c.  Damages

Having found that All Professional infringed upon

Century 21's trademarks, the court next determines the

appropriate damages.  The damages provision of the Lanham Act

states:

> When a violation of any right of the
> registrant of a mark . . . shall have been
> established in any civil action arising under
> this chapter, the plaintiff shall be entitled
> . . . to recover (1) defendant's profits, (2)
> any damages sustained by the plaintiff, and
> (3) the costs of the action.

15 U.S.C. § 1117(a).  Century 21 requests treble damages of

$86,022.00.

Century 21 claims that it was damaged in an amount

equal to the minimum franchise fees that All Professional would

have been required to pay to continue using Century 21's marks

for its three operational offices under the franchise agreements.

The minimum franchise fees total $3,186.00 per month for the

1   three franchises.  This estimation of damages is reasonable
2   because it represents the minimum amount that Century 21 would
3   have received if All Professional had been authorized to use
4   Century 21's marks, and, if anything, Century 21's actual damages
5   could have been higher than this figure.  Because All
6   Professional continued to take advantage of the franchise
7   agreements' benefits, enforcement of All Professional's
8   obligations under the agreements is appropriate.

9        As the court discussed above, All Professional's use of
10  Century 21's mark was willful.  When the infringer's use of a
11  counterfeit mark is willful, section 1117(b) requires the court
12  to award treble damages unless the court finds extenuating
13  circumstances.  15 U.S.C. § 1117(b).  There are no such
14  extenuating circumstances in this case.  All Professional's
15  infringement was willful and it refused to de-mark until the
16  court issued an order enjoining its use of the marks.

17       All Professional argues that treble damages may only be
18  applied to provide compensation and not punishment, however the
19  cases that it relies upon discuss the award of treble damages
20  under § 1117(a) and not § 1117(b).  Under § 1117(a), a court may
21  enhance actual damages to a level, not to exceed three times
22  actual damages, when the award of actual damages would not be
23  sufficient to adequately compensate the trademark holder.  Id.
24  § 1117(a).  Under § 1117(b), the court shall award treble damages
25  unless there are extenuating circumstances, suggesting that the
26  purpose of § 1117(b) is punishment and not compensation.  The
27  court is therefore not prohibited from awarding treble damages
28  under § 1117(b) that may serve primarily to punish All

64

1   Professional.

2         All Professional continued to use Century 21's marks

3   for more than nine months after it was informed of the

4   termination of its franchises and instructed to discontinue use

5   of the marks.  All Professional has presented no material facts

6   suggesting that an award of actual damages equal to its minimum

7   franchise fees is not proper.  It is additionally beyond dispute

8   that All Professional's use of Century 21's marks was willful

9   during this period.  Accordingly, the court will grant Century

10  21's motion for summary adjudication of damages on its trademark

11  infringement and unfair competition claims in the amount of

12  $86,022.00.

13        B.   All Professional's Claims

14             1.   Breach of Contract

15        All Professional relies on the same arguments to

16  support its breach of contract claim as it did in defense of

17  Century 21's breach of contract claim.  As the court discussed

18  above, All Professional fails to raise a genuine issue of

19  material fact suggesting that Century 21 breached the franchise

20  agreements or the DAN.  Accordingly, the court will grant

21  Century 21's motion for summary adjudication as to All

22  Professional's claims for breach of contract.

23             2.   Unfair Competition

24        All Professional and the Wrights assert a claim for

25  violation of California's Unfair Competition Law ("UCL").  See

26  Cal. Bus. & Prof. Code § 17200, et seq.  The court has found,

27  however, that New Jersey law is applicable in this action and

28  the parties have not suggested that New Jersey has an analogous

65

1  UCL claim.  See Medimatch, Inc. v. Lucent Techs., Inc., 120 F.

2  Supp. 2d 842, 861-62 (N.D. Cal. 2000) (dismissing California UCL

3  claim on basis that claim fell within scope of New Jersey

4  choice-of-law provision).  Accordingly, the court will grant

5  Century 21's motion for summary adjudication with respect to All

6  Professional's UCL claim.

7          3.    Implied Covenant of Good Faith and Fair Dealing

8          Under New Jersey law, there is an implied covenant of

9  good faith and fair dealing in every contract.  Onderdonk v.

10 Presbyterian Homes, 85 N.J. 171, 182 (1981).  The implied

11 covenant prohibits a party to the contract from doing anything

12 that "will destroy or injure the right of the other party to

13 receive the fruits of the contract."  Feldman v. U.S. Sprint

14 Commc'ns Co., 714 F. Supp. 727, 731 (D.N.J. 1989).  However, the

15 "function of the court is to enforce the [agreement] as written,

16 not to write for the parties a different or a better contract."

17 Liqui-Box Corp. v. Estate of Elkman, 238 N.J. Super. 588,

18 599-600 (App. Div. 1990).  "Although the implied covenant of

19 good faith and fair dealing cannot override an express term in a

20 contract, a party's performance under a contract may breach that

21 implied covenant even though that performance does not violate a

22 pertinent express term."  Wilson v. Amerada Hess Corp., 168 N.J.

23 236, 244 (2001) (citing Sons of Thunder, Inc. v. Borden, 148

24 N.J. 396, 419 (1997)).  The New Jersey Supreme Court has

25 cautioned, however, that "an allegation of bad faith or unfair

26 dealing should not be permitted to be advanced in the abstract

27 and absent an improper motive."  Id. at 251.

28          All Professional argues in conclusory fashion that

Century 21 breached the implied covenant of good faith and fair dealing for the same reasons that it alleges Century 21 breached the franchise agreements.  As the court discussed above, adopting All Professional's interpretation of the franchise agreements would be either inconsistent with or contrary to the express provisions of the agreements.  All Professional provides no justification for why any of these alleged breaches should be considered differently under the implied covenant than under All Professional's breach of contract claim.[31]

In addition to the alleged contract breaches that All Professional presented, All Professional argues two additional ways in which Century 21 breached the implied covenant.  The first claim is that Century 21 engineered the termination of All Professional's franchises because of pressure from competing Century 21 brokers.  All Professional fails, though, to provide any explanation of how Century 21 was able to engineer the terminations.  Indeed, given that it was All Professional's decision to close its Folsom franchise, stop paying its franchise fees, and not cure its defaults during the cure period it would seem unlikely that Century 21 would have been able to do so.  All Professional similarly fails to provide any authority in support of its claim.

Second, All Professional argues that Century 21

---

[31]    All Professional additionally argues that under California law, Century 21 was obligated to exercise its discretion in good faith.  (See Opp'n to Mot. for Summ. Adjudication at 32:19-26.)  It is unclear to the court what discretionary decision All Professional refers to.  As the court has found throughout its order, there is no evidence that Century 21 acted outside the authority granted to it under the franchise agreements or that its actions were taken in bad faith.

breached the implied covenant of good faith and fair dealing
when it disregarded its own policy by terminating All
Professional's franchises despite its "good faith attempts to
pay the service fees and restructure the DAN note." (Opp'n to
Mot. for Summ. Adjudication at 33:13-14.)  Century 21 though was
not obligated to provide All Professional a payment plan, nor
was it obligated to continue negotiations with All Professional
on reaching a payment agreement when the cure date had passed
over two months before.  All Professional has not produced any
evidence other than the franchise agreements that would suggest
that All Professional had a legitimate reason to expect that its
good faith efforts should have forestalled termination.  Nor has
All Professional presented any authority suggesting that
franchisors may not terminate franchises for failure to meet
financial obligations when franchisees act in good faith under
the implied covenant of good faith and fair dealing.

All Professional's laundry list of Century 21's
alleged violations of the implied covenant of good faith and
fair dealing fails to establish any material facts suggesting
that Century 21 acted in a manner that injured All
Professional's right to receive the benefits of the franchise
agreements.  Accordingly, the court will grant Century 21's
motion for summary adjudication on All Professional's claim for
breach of the implied covenant of good faith and fair dealing.

4.  Fraud

Under New Jersey law, the essential elements of fraud
are (1) a material representation pertaining to a presently
existing or past fact; (2) made with knowledge of the falsity of

68

the representation and with an intention that the other party

rely on the representation; and, (3) justifiable reliance on the

representation which results in actual damage.  Gennari v.

Weichert Co. Realtors, 148 N.J. 582, 610 (1997) (citing Jewish

Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619 (1981)).  All

Professional identifies two alleged misrepresentations that it

argues are actionable under its fraud claim: (1) Omer's comment

that Century 21 would provide "tools and systems" to increase

All Professional's productivity; and (2) Popp's representation

that he would "take care of the issues" with Corporate after All

Professional defaulted under its franchise agreements.[32]

Under New Jersey law, "[t]he fraud must be in the

original contract or transaction and not in the nonfulfillment

of the contract."  Anderson v. Modica, 4 N.J. 383, 392 (1950)

(citing Ebert v. Givas, 158 A. 412, 413-14 (N.J. Err. & App.

1931)).  "It is the general rule that fraud cannot be predicated

upon statements which are promissory in their nature at the time

they are made and which relate to future actions or conduct.

Thus fraud cannot be predicated upon the mere non-performance of

a promise."  Barry by Ross v. N.J. State Highway Auth., 245 N.J.

Super. 302, 310 (1990).  A failure to fulfill a promise may

constitute a breach of contract, but it is not fraud and the

non-performance of that promise does not make it so.  Anderson,

---

[32]    In its interrogatory response regarding this claim, All
Professional actually identified eleven separate representations
that it would rely upon for its fraud claim.  In its motion for
summary adjudication Century 21 addressed all eleven claims.  All
Professional only mentioned one of these alleged
misrepresentations in its opposition papers and acknowledged
during oral arguments that it was not pursuing claims under the
representations that it did not address.

4 N.J. at 392.  "Such conduct is a misrepresentation only if the promisor knew when he made it that the promise could not or would not be fulfilled."  Barry by Ross, 245 N.J. at 310 (citing Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 380-81 (App. Div. 1960).

First, All Professional argues that in 2005, at the time it was signing franchise renewals and the DAN, Omer falsely represented that Century 21 was going to develop tools and systems that would keep All Professional productive so that they would not have to pay back the DAN.  This representation is not actionable under New Jersey law because it does not relate to a past or present fact, but is rather a prediction about what Century 21 would do in the future.  See Anderson, 4 N.J. at 391-92.  All Professional does not present any evidence suggesting that when Omer made these representations he knew that Century 21 would not be developing such tools and systems.

All Professional additionally fails to demonstrate that it reasonably relied on Omer's statements and would have acted differently had the alleged misrepresentations not been made.  "Reliance is not reasonable where the substance of the alleged misstatement is contradictory of any of the undertakings expressly dealt with by the written contract."  Luso Fuel, Inc. v. BP Prods. N. Am., Inc., No. 08-CV-3947, 2009 WL 1873583, at *5 (D.N.J. June 29, 2009) (citing Winonka Village, Inc. v. Tate, 16 N.J. Super. 330, 334 (App. Div. 1952)).  Here, the alleged representation that repayment would not be required contradicts the repayment provision in the DAN, the Security Agreement setting forth collateral to secure the DAN, and the addendum to

70

the River Park franchise agreement.  Given the terms of these contracts, any reliance on Omer's statements was unreasonable. All Professional thus fails to establish material facts suggesting that Omer's statement was a fraudulent misrepresentation.

Second, All Professional argues that while it was negotiating an alternate payment plan for its default, Popp affirmatively represented that he would "take care of the issues" with Century 21's corporate team.[33]  As an initial matter, the only evidence that All Professional relies upon to suggest that this representation was actually made is Steve Wright's declaration that was attached to All Professional's opposition papers.  (See Steve Wright Decl. II, ¶ 13 ("From June 18, 2010 until July 9, 2010, I spoke with Mr. Popp several times where he repeatedly assured me that he was working out the payment terms with 'New Jersey' (Century 21's executive team).").)[34]  The fact that Popp was "working out the payment

---

[33]   Century 21 objects to All Professional's reliance on this representation because it was not listed in All Professional's interrogatory response as one of the misrepresentations that All Professional intended to rely upon. The court will nonetheless consider All Professional's argument on the matter.

[34]   During Steve Wright's deposition, he also talked about two phone calls that he had with Popp that Steve Wright described as "his assurances that this would all work out."  (Steve Wright Dep. I at 213:6-7.)  When asked to discuss these phone calls in greater detail, Steve Wright described the first call as Popp giving him a "one sentence spiel: I'll talk to Corporate, and we'll see if we can work it out.  Just give me a couple of days, click."  (Id. at 213:21-23.)  In the second phone call, Popp "said he was going to call Corporate, and he would call us back, and he never did."  (Id. at 214:4-5.)  Neither of these phone calls support All Professional's argument that Popp said that he would "take care of issues" with Corporate or provide an assurance that "this will all work out."

terms" is a far cry from All Professional's interpretation of this statement as being that Popp "would take care of issues."

Assuming that All Professional did have sufficient evidence to prove that this representation was made, All Professional's claim still fails as a matter of law.  It is not clear that the purported statement is a misrepresentation of fact, rather than an ambiguous statement regarding a future action that Popp would take.  See Anderson, 4 N.J. at 391-92 (stating that a misrepresentation must be about past or present fact).

All Professional additionally fails to present evidence that Popp knew that this representation was false at the time he spoke with the Wrights.  The only evidence All Professional presents actually establishes the opposite -- in an email sent by Popp to Bainbridge on July 12, 2010, he states that he "thought we were getting close on a deal." (Compendium of Exhibits Ex. 34.)  This statement, made at least three days after All Professional argues the alleged misrepresentation was made, strongly suggests the Popp did not know that All Professional's attempt to negotiate an alternative payment plan would be unsuccessful.

Finally, All Professional's fraud claim fails because it is unable to show reliance on Popp's statement to its detriment.  Any alleged statement by Popp was made after All Professional's missed cure date of May 10, 2010, so reliance on a statement made in either June or July fails to explain why All Professional did not cure its default.

There are no material facts supporting All

72

1   Professional's claim for fraud against Century 21.  Accordingly,

2   the court will grant Century 21's motion for summary

3   adjudication as to All Professional's fraud claim.

4          5.   Interference with Business Advantage/Contract

5          All Professional brings three causes of action related

6   to Century 21's alleged interference with its business: (a)

7   Intentional Interference with Business Advantage; (b) Negligent

8   Interference with Business Advantage; and (c) Interference with

9   Contract.  All of these claims are based on All Professional's

10  allegations that Century 21 deliberately disrupted All

11  Professional's relationships with its own agents, customers, and

12  potential customers in retaliation for Steve Wright's complaints

13  about Century 21's favorable treatment of Century 21 Select.

14            a.   Intentional Interference

15          Although torts for interference with contract are

16  separate from interference with business advantage, see Printing

17  Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 750 (1989)

18  (stating "[t]he separate cause of action for the intentional

19  interference with a prospective contractual or economic

20  relationship has long been recognized as distinct from the tort

21  of interference with the performance of a contract"), the

22  elements of each claim are the same.  See Jenkins v. Region Nine

23  Hous. Corp., 306 N.J. Super. 258, 265 (App. Div. 1997) ("Whether

24  the tort is denominated as an intentional interference with

25  contractual advantage, or future economic advantage, the import

26  is the same.").  To recover under a claim for tortious

27  interference, a plaintiff must prove: "(1) a protected interest,

28  not necessarily amounting to an enforceable contract; (2)

73

defendant[s'] intentional interference without justification; (3) a reasonable likelihood that the benefit plaintiff anticipated from the protected interest would have continued but for the interference; and (4) resulting damage." Id.

To succeed on its claims for intentional tortious interference, All Professional must show that Century 21's alleged conduct constituting interference was intentional and with "malice." See Printing Mart, 116 N.J. at 751 (stating a complaint of tortious interference "must allege facts claiming that the interference was done intentionally and with 'malice'"). Malice is defined as intentionally inflicted harm without justification or excuse. Id. A determination of malice must focus on a defendant's action as presented by the unique facts of each individual case. Id. at 756–57. "Not only must [a] defendant[']s[ ] motive and purpose be proper but so also must be the means." Id. at 757 (alterations in original) (internal quotation marks and citation omitted). However, "[c]onduct admittedly spurred by spite and ill-will is not necessarily sufficient to sustain an action for tortious interference with an economic advantage." Lamorte Burns & Co. v. Walters, 167 N.J. 285, 307 (2001). "The line clearly is drawn at conduct that is fraudulent, dishonest, or illegal and thereby interferes with a competitor's economic advantage." Id.; see also Shebar v. Sanyo Bus. Sys. Corp., 218 N.J. Super. 111, 118 (App. Div. 1987) (finding an employee who was fired after his employer used deceit to induce him to revoke acceptance of an outside employment offer until a replacement was found satisfied the malicious interference requirement).

1    All Professional fails to specifically address the

2  malice requirement.  Instead, it suggests that Century 21's

3  wrongful conduct, engineering the terminations of All

4  Professional's franchises, was motivated largely because of

5  Steve Wright's continuous, unresolved complaints about Select

6  and Century 21's preference toward Select.  All Professional

7  then proceeds to repeat the same laundry list of complaints that

8  this court has repeatedly addressed and found not to be breaches

9  of contract or fraudulent.[35]  Although Steve Wright's contentious

10  behavior may have contributed to feelings of ill will between

11  the parties, in order to show that Century 21's actions rise to

12  the level of malice, All Professional must show that the actions

13  lacked justification or excuse.  <u>See</u> <u>Printing Mart</u>, 116 N.J. at

14  751.

15    "A party's actions in its own interest and for its own

16  financial benefit will not rise to the level of malice."

17  <u>Cargill Global Trading v. Applied Develop. Co.</u>, 706 F. Supp. 2d

18  563, 575 (D.N.J. 2010).  Instead, a business-related explanation

19  can justify a party's actions, so long as the business-related

20  explanation justifies not only the defendant's motive and

21  purpose, but also the means that it employed.  <u>See</u> <u>Lamorte Burns</u>

22  <u>& Co.</u>, 167 N.J. at 307.  In <u>Ideal Dairy Farms, Inc. v. Farmland</u>

23

24    [35]    All Professional also argues that "Century 21's sharing
of All Professional's business methods to Select was a violation
25  of California Trade Secrets Act."  (Opp'n to Mot. for Summ.
Adjudication at 38:11-13 (citing Cal. Civ. Code § 3426.1).)
26  Other than alleging that Century 21 shared information regarding
All Professional's financial difficulties, there is no evidence
27  that Century 21 shared information regarding All Professional's
"business methods."  All Professional does not explain how these
28  undefined methods might qualify as trade secrets or violate the
Trade Secrets Act.

<u>Dairy Farms, Inc.</u>, 282 N.J. Super. 140, 205 (App. Div. 1995),
the New Jersey Appellate Division reversed a trial court's
finding of tortious interference, noting that even if the
defendant's behavior had been motivated by spite and was
directly aimed at hurting the plaintiff's business, this did not
rise to the level of tortious interference because defendant had
a "legitimate business reason to 'target' [the plaintiff] . . .
regardless of any other motivation." <u>Id.</u> at 201; <u>see also</u> <u>Cedar
Ridge Trailer Sales, Inc. v. Nat'l Cmty. Bank of N.J.</u>, 312 N.J.
Super. 51, 67 (App. Div. 1998) ("At worst, the Bank was
advancing its 'own interest and financial position,' which is
not enough to establish tortious interference.").

        The court finds that the undisputed evidence shows
that Century 21's actions were motivated by a genuine business
concern and therefore did not rise to the level of malice
required to bring a claim for intentional tortious interference.
Accordingly, the court will grant Century 21's motion for
summary adjudication of All Professional's claims for
intentional interference with business advantage and
interference with contract.

                    b.   <u>Negligent Interference with Business
                         Advantage</u>

        All Professional additionally brings a claim for
negligent interference with business advantage, although it
fails to address the application of New Jersey law to this

1   claim.[36]  Although there is very little New Jersey caselaw

2   addressing negligent interference claims, the court has located

3   two cases that rely on People Express Airlines to suggest that

4   negligent interference with prospective advantage claims may be

5   brought under New Jersey law.  See Eaton v. Tosti, Civ. No. 09-

6   5248, 2010 WL 2483318, at *9 (D.N.J. June 4, 2010) (citing

7   People Express Airlines Inc. v. Consol. Rail Corp., 100 N.J.

8   246, 263 (1985)); Reed Elsevier, Inc. v. Inherent.com, Inc.,

9   Civ. No. 05-4048, 2006 WL 3827414, at *7 (D.N.J. Dec. 27, 2006)

10  (citing People Express Airlines, 100 N.J. at 263).  The People

11  Express Airlines court, however, only held that purely economic

12  loss caused by negligence is compensable in tort, not that there

13  is a cause of action for negligent interference.  See People

14  Express Airlines, 100 N.J. at 263.

15          The vast majority of New Jersey precedent instead

16  discusses claims for tortious interference, as opposed to

17  intentional or negligent interference.  See, e.g., Printing

18  Mart, 116 N.J. at 751; Cargill, 706 F. Supp. 2d at 575; Jenkins,

19  306 N.J. Super. at 265.  These decisions suggest that in order

20  to state a claim for tortious interference, the plaintiff must

21  demonstrate that the defendant acted with malice.  See Cargill,

22  706 F. Supp. 2d at 575.  Malice is traditionally not a required

23  element of a negligent interference claim, thus, these cases

24  suggest that plaintiffs may not bring a claim for negligent

25

26          [36]   It is interesting to note that when All Professional
27  answered the complaint that Century 21 filed in New Jersey state
    court, All Professional's counterclaim alleged a cause of action
28  for tortious interference and not intentional or negligent
    interference.

interference under New Jersey law.  Given that the overwhelming majority of New Jersey cases only discuss claims for tortious interference, this court finds that there is no cause of action under New Jersey law for negligent interference with business advantage.

Even if the court were to find that All Professional could bring a claim for negligent interference under New Jersey law, neither of the New Jersey cases applying the claim suggest what the elements of negligent interference would be.  Instead, both cases quote language from People Express Airlines discussing the duty of care that a defendant owes to a plaintiff.  See Eaton, 2010 WL 2483318, at *9 (citing People Express Airlines, 100 N.J. at 263); Reed Elsevier, 2006 WL 3827414, at *7 (citing People Express Airlines, 100 N.J. at 263).  The court would therefore apply the four part test from New Jersey's intentional interference claim, with the exception that under the second element -- intentional interference without justification -- All Professional would need only show that Century 21's interference was negligent.  A showing of negligence further requires All Professional to demonstrate that Century 21 violated a duty of care that it owed to All Professional.  See People Express Airlines, 100 N.J. at 263.

In support of its claim, All Professional merely asserts the same laundry list of reasons why it believes that Century 21's conduct was wrongful.  All Professional does not discuss what duties Century 21 owed to it or how Century 21's actions or inactions constituted a breach of this duty (but not a breach of contract).  Century 21's termination of All Professional's franchises may have

78

interfered with its business interests, but the court has already held
that the termination was proper and not wrongful.  All Professional's
other claims largely stem from complaints regarding Century 21's
inaction, however All Professional has not suggested that Century 21
had a duty to act.  All Professional fails to raise material facts
establishing a claim for negligent interference.

Accordingly, the court will grant Century 21's motion for
summary adjudication as to All Professional's claim for negligent
interference with business advantage.

### 6.   Violation of Franchise Investment Laws

Finally, All Professional alleges that Century 21 violated
California's Franchise Investment Law, Cal. Bus. & Prof. Code § 20000,
et seq., and Hawaii's Franchise Investment Law, Haw. Rev. Stat.
§ 482(E), by terminating the franchise agreements without cause.  As
an initial matter, application of either California's or Hawaii's
statutory franchise provisions is inappropriate given the franchise
agreements' valid New Jersey choice-of-law provision.  Even if
consideration of All Professional's claim were proper, the court has
rejected All Professional's allegation that Century 21 lacked good
cause to terminate its franchises.  Accordingly, the court will grant
Century 21's motion for summary adjudication as to All Professional's
claim for violation of franchise investment laws.

IT IS THEREFORE ORDERED that:

(1) Century 21's motion for summary adjudication of its
claim for breach of contract be, and the same hereby is, GRANTED IN
PART with respect to Century 21's claim for breach of contract, actual
damages totaling $195,454.90, and future lost profits totaling
$575,001.57, and DENIED IN PART with respect to Century 21's request

79

1  for $1,500.00 in actual damages;

2          (2) Century 21's motion for summary adjudication of its

3  claim for breach of guaranty be, and the same hereby is, GRANTED;

4          (3) Century 21's motion for summary adjudication of its

5  claims for trademark infringement and unfair competition be, and the

6  same hereby is, GRANTED and Century 21 is awarded treble damages in

7  the amount of $86,022.00;

8          (4) Century 21's motion for summary adjudication of all of

9  All Professional and the Wrights' claims be, and the same hereby is,

10 GRANTED; and

11         (5) Steve Wright, Carol Wright, and All Professional are

12 HEREBY PERMANENTLY ENJOINED from further unauthorized use of Century

13 21's Marks, as defined in the franchise agreements.

14         This matter shall remain on calendar for a pretrial

15 conference on September 17, 2012, and bench trial on October 30, 2012,

16 on Century 21's remaining claims, including Century 21's $1,500.00

17 damages request for breach of contract.  If Century 21 files a written

18 statement within 15 days from the date of this Order, dismissing its

19 remaining claims and agreeing to accept judgment in accordance with

20 this Order, the court will vacate the pretrial conference and trial

21 dates enter final judgment in accordance with this Order.

22 DATED:  August 7, 2012

23

24 _____

WILLIAM B. SHUBB

25 UNITED STATES DISTRICT JUDGE

26

27

28

80